. UNITED STATES of America, Plaintiff,

v.

Adele SCHMITT, John Schmitt and Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, and Carl Mednica, individually and as President of Cave Diggers, Inc., and Adam Schmitt d/b/a Adams Fishing Station, Defendants.

John SCHMITT and Adam Schmitt, d/b/a Channel Marine Suzucki and Channel Marine Sales, Inc. known as Schmitt's Marina, Third–Party Plaintiffs,

v.

The CITY OF NEW YORK, Third–Party Defendant.

No. CV 89–2126 ADS.

United States District Court, E.D. New York.

March 31, 1998.

Zachary Carter, United States Attorney, Brooklyn, NY by Kevan Cleary, Senior Trial Counsel, for plaintiff.

Citak & Citak, New York City (Burton Citak, Gary Westfal, of Counsel), for defendants and third-party plaintiffs.

Paul Crotty, Corporation Counsel for the City of New York, New York City by Warren Shaw, Assistant Corporation Counsel, for third-party defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The United States House of Representatives made the following observation of Jamaica Bay in a report on the proposed Gateway National Park:

> The natural values of the area are astonishing. Here, one can escape the maddening crowds and be exposed to a wildlife sanctuary. Against the backdrop of the Manhattan skyline, he can observe numerous species of waterfowl and shorebirds that use the area as a nesting ground.

The saga of the development of the marina in Broad Channel known as the "Schmitt Marina," closely tracks the interesting history of the community in Queens County known as "Broad Channel," the only inhabited island in Jamaica Bay, known as the "Venice of New York" and the "Gateway to the Rockaways."

## I. HISTORICAL BACKGROUND

During these many hearings, the Court was furnished with a number of maps and aerial photographs and a history of Jamaica Bay (Def.Ex. C) which greatly aided the Court's endeavors. Also, the Court notes that the defendant John Schmitt personally obtained from the City of New York and other sources a plethora of maps, charts, photographs and other documents. These documents were of valuable assistance to the Court in its task of discerning the evolving history of the Broad Channel Community and recording a chronological review of the events that are relevant to these proceedings.

Jamaica Bay is located in the western portion of the south shore of Long Island. The Rockaway Peninsula is to the south of Jamaica Bay and is a long, narrow piece of land which forms a barrier between Jamaica Bay and the Atlantic Ocean. Jamaica Bay is bordered on the north by the mainland of Brooklyn, Queens and Nassau Counties.

Jamaica Bay is an estuary, meaning a body of ocean water diluted by fresh water runoffs from the land north of the Bay consisting of 18,000 acres of land and water in the shadow of the World Trade Center. It is one of the largest open spaces in Brooklyn and Queens, and is operated as a wildlife preserve. This grassy bay has become a haven for a multitude of fish, animal and floral wildlife. Jamaica Bay also is a stopover for migrating birds of all kinds. The grasses in the Bay provide prime spawning ground for a myriad of species of fish and minute animal life.

In the late nineteenth century there was a considerable development of Rockaway Beach, both in hotels and other residences. In the 1880s, a train track was constructed over the water of Jamaica Bay from the then Village of Jamaica south to the Rockaways. This rail line triggered further development of the Rockaways. On the path to the Rockaways, the trains stopped at a number of "fishing stations" along Jamaica Bay. These fishing stations, located in the middle of the bay, were docks at which fishing boats were tied up with a few buildings around the station.

One of the fishing stations in Jamaica Bay was called "Broad Channel," named for the channel near the station. The 1890 Hyde map and enlargement (Pl. Exs. 48 and 49)[1] reveal that the Broad Channel Fishing Station was comprised of four or five buildings located on a small island north of a larger, uninhabited, grass island called "The Big Egg Marsh," separated by a salt water channel. A photograph probably taken in the early 1900s, shows people waiting for a train at the "L.I.R.R. Ticket Office" at the "Broad Channel" station (Pl.Ex. 56).

A 1907 map of Jamaica Bay shows an area designated "sand filling" (Pl.Ex. 57, Tr. at 5459).[2] This area eventually became part of Jamaica Bay Boulevard, later renamed Cross Bay Boulevard, which traverses the Bay from the Belt Parkway area to the Rockaways in a generally north-south direction. (See the artist's rendering of Jamaica Bay Boulevard made in the early 1900, [Pl.Ex. 53].) During this period the saltwater passage between Broad Channel Island and Big Egg Marsh Island was filled in. From that time on, the two islands effectively merged into one, variously called Broad Channel and Big Egg Marsh.

### A. The Noel Lease

In 1912, the New York State Legislature granted to the City of New York ("the City") title to the land and land under water in Jamaica Bay. On December 16, 1914, the City leased a boot-shaped parcel, which included Broad Channel and the Big Egg Marsh, to a developer named Pierre Noel, whose company was called the Broad Channel Corporation. Noel intended to use the leasehold for residential and commercial purposes (Def.Ex. B–152). The Jamaica Bay History (Def.Ex. C) records that in 1914 "all of Big Egg Marsh was leased to Pierre Noel for a term of ten years ... [with] the right to renew the lease for two ten-year terms." The area leased was described as comprising "454.22 acres" (Def.Ex. B–152). A 1914 map indicates that the entire Broad Channel area was called "Big Egg Marsh", was unsettled and without any buildings. (Def.Ex. B–152). However, by 1947, Broad Channel was divided into blocks and lots, and only the marsh area to the south and in the toe of the boot was called "Big Egg Marsh" (Def.Ex. 153).

An important document, often referred to during the trial, is what is known as the Noel Developer's Map (City Ex. DA). This map, entitled "Map of Broad Channel Beach," depicts Noel's development plan for a proposed "Broad Channel Beach." In this map, Noel laid out a network of streets and numbered blocks-lots in the portion of the boot-shaped

---

**1.** Plaintiff's Exhibits are referred to as "Pl.Ex.," Defendant Schmitt Exhibits are referred to as "Def.Ex." and Third–Party Defendant City of New York Exhibits are referred to as "City Ex.".

**2.** Tr. refers to the pages in the trial transcript.

parcel that eventually was developed into a residential and commercial area. The area to be developed shows 19 small parallel canals running in an east-west direction, to be dredged on the west side of Jamaica Bay Boulevard (now known as Cross Bay Boulevard). The canals are interspersed with short streets coming off the west side of Jamaica Bay Boulevard at right angles. (*See* Appendix Figure 1).

The Noel Developer's Map reveals that a large part of the southerly portion of the boot-shaped leasehold, the foot of the boot, was left undeveloped and in its natural state. There were no streets or canals in that southern portion. This undeveloped southern portion is referred to as the "Big Egg Marsh," the same name as the entire large marsh island now known as Broad Channel was formerly known. This area, south of the flourishing Broad Channel Community, has remained undeveloped to this day, and is the home of countless fish, bird, animal and other wildlife species.

Noel leased portions of the developed land in Broad Channel to individuals for residential and business purposes. Apparently Noel encountered financial difficulties during the Depression, and the City terminated his lease in 1939. From that time on, the City assumed the role of direct landlord to the former subtenants of Noel and all other tenants of Broad Channel. These lessees, almost all residential, then became month-to-month tenants of the City. The leases issued by the City used the block and lot designations set forth on the Developer's Map. The southerly marsh area, including the Big Egg Marsh, remained natural and undeveloped.

In tracing the historical development of the Broad Channel Community, there is some confusion caused by the fact that in some documents the names "Broad Channel" and "Big Egg Marsh" were used interchangeably to describe the same property. A good illustration of this interchange of names is shown in the pamphlet entitled "Jamaica Bay, A History" (Def.Ex. C). The first map in the pamphlet dated in 1911, prior to the Noel development (Figure 16), refers to the entire boot-shaped area as "Big Egg Marsh." However, the third map in the

pamphlet dated 1940 (Figure 18), designates only the southerly undeveloped portion of the boot as "Big Egg Marsh".

## B. *The Robert Moses Plan*

By the 1930s, New York City Parks Commissioner Robert Moses had plans for the 18,000 acres of water, marshland and meadowland in Jamaica Bay as "offering unlimited possibilities for recreational and residential development . . . [on] the natural grassy islands." He envisioned public use of the meadowlands adjoining Cross Bay Boulevard, including Big Egg Marsh, and purification of the Bay's polluted waters. (Def.Ex. C). Moses also proposed to transfer all the islands of the Bay to the Department of Parks for recreational use, including fishing and boating, and for the preservation of wildlife.

The Moses vision was realized when the City transferred most of the Bay and its marsh islands, except a portion of Big Egg Marsh, to be retained by the Bureau of Real Estate, to the New York City Department of Parks on July 15, 1945. (N.Y.C. Local Law Nos. 31 and 32; Def.Ex. B–319). The city park area was known as the Jamaica Bay Wildlife Refuge. As noted in all the local laws and documents, and is stipulated by the parties, the boot-shaped area known as Broad Channel and Big Egg Marsh was not part of this City park land.

In 1946, the City formally adopted a street map for Broad Channel (City Ex. DB). The City continued to issue leases for occupancy of portions of Broad Channel. By 1982 there were approximately 900 residential tenancies and 50 commercial tenancies on Broad Channel. (Tr. at 6857–6858). A 1941 map, updated to 1951 by the United States Engineer's Office (Pl.Ex. 40), clearly shows this developed area of Broad Channel and the undeveloped area known as the Big Egg Marsh.

## C. *The Gateway National Park*

On October 27, 1972, Congress passed an act to establish the Gateway National Recreation Area. The actual conveyance of the property from the City of New York to the Federal Government occurred on March 1, 1974. The stated purpose of the Gateway Act is "to preserve and protect for the use

and enjoyment of present and future generations an area possessing outstanding natural recreational features." The Gateway National Park includes Jamaica Bay, Breezy Point and Sandy Hook. In the Gateway National Park is the Jamaica Bay Wildlife Refuge which encompasses "all islands, marshes, hassocks, submerged lands and waters in Jamaica Bay, Floyd Bennett Field, the lands generally located between highway Route 27A and Jamaica Bay up to the shoreline of John F. Kennedy International Airport." 16 U.S.C. § 460cc(a). The Gateway National Park does not include the Broad Channel Community.

Among the provisions of the Gateway Act is the following:

[t]hat the Secretary (of the Interior) shall administer and protect the islands and water within the Jamaica Bay Unit with the primary aim of conserving the natural resources, fish, and wildlife located therein and shall permit no development or use of this area which is incompatible with this purpose.

16 U.S.C. § 460cc(a).

In addition to the enthusiastic and descriptive language in the House of Representatives Report cited in the opening words of this opinion, the United States Senate report on the bill which became the Gateway Act also praised Jamaica Bay:

Jamaica Bay fascinates biologists and the nature-minded not only for its wealth of birdlife but also because of the seemingly sturdy health of its ecological communities in the midst of unhealthy conditions. Though poor in its water purity rating, it is rich in fish and wildlife. Some 200 species of birds have been reported in Jamaica Bay at breeding and migration periods. It is a strategic nesting ground for birds along the Atlantic flyway. To have this outdoor research laboratory within a region of 20 million people is of undeterminable value.

Sen. Report No. 92–345, p.4.

The map depicting the outer perimeter of the Gateway National Recreational Area, dated May 1972, was admitted in evidence as Def.Ex. B–555(a). As stated above, the Gateway Act excluded the Broad Channel Community. While the Gateway Act defined the outer perimeter of Jamaica Bay to be included within the national park, Congress did not fix the borders of the Broad Channel Community. The Gateway National Park boundaries were established by the United States National Park Service and the City in a "Gateway Conveyance Map" adopted in 1973 (Pl.Ex.38B–1).

A review of the crucial Gateway Conveyance Map reflects that the Broad Channel Community area was excluded from the Gateway conveyance by the City to the United States. Significantly, the southwestern, lower portion of the boot, labeled the "Big Egg Marsh," is clearly within the grant of the City to the Gateway National Recreational Area, and since 1973, is owned by and within the jurisdiction of the United States National Park Service. Thus, the Court finds that while the Broad Channel Community area was excluded from the Gateway National Park, Big Egg Marsh at the foot of the boot *was* included in the conveyance by the City to the United States.

By laws passed in 1973, the City decided to sell the Broad Channel property to its tenants. (Def.Exs. B–55 and B–555). In 1980 the City effectuated the plan to sell the Broad Channel property to "the homeowners" (*see* letter from Deputy Commissioner Herschman dated May 1, 1980; Def. Ex. B–411).

### D. *The Schmitt Leaseholds*

There are three sets of leases that are relevant to the issues in this case. First, there are the leases directly involving the Schmitt Marina. Second, there are the leases to John Orean, in an area called John's Fishing Station, which eventually were assigned to the Schmitts. Third, are the leases involving the residence of Adam and Ernestine Schmitt. The Court separately will discuss each of the leases and the related documents.

The evidence reveals that Adele Schmitt ("Adele"), mother of the defendant Adam Schmitt ("Adam") and grandmother of the defendant John Schmitt ("John") purchased a small boatyard in Broad Channel on Octo-

ber 19, 1944. (Def.Ex.B–33) for "vacant tide and march [sic] land" at the Foot of West 20th Road. The area she occupied was used to rent row boats and included a houseboat as an office with an unpaved access road. Water traversed under the houseboat office. At that time Adele maintained a single dock in the water. This dock which will be referred to as "Dock A," was located near the foot of West 20th Road.

Adele obtained two permits for the area around the foot of West 20th Road. The first permit, dated January 9, 1945 (Del.Ex.SS, Pl.Ex.33)), covered an "area 50' X 100' of marsh land at foot of West 20 Road." The purpose of the occupancy was "For location of houseboat, to be used as a fishing station, and for no other purpose whatsoever." The rent was $8.33 per month on a month-to-month basis. The second permit was dated November 1952 for the location "Foot of West 20 Road, Part of Block 210 ... marshland." The purpose of this occupancy was boat storage and the rent was $25.00 per month. (Def.Ex.TT).

### (1) *The Schmitt Leases at Block 210—Foot of West 20th Road*

Among the voluminous documents in evidence, are the marina leases from the City to Adele. The first such lease is dated July 1, 1959 (City Ex. DK, Def.Ex. B–400). The rent was $134 per month with a deposit of $268 for this monthly lease. The description of the premises leased is "Foot of West 20th Road ... Block 210 ... Lot (marsh land) Queens (Broad Channel)" to be used for "boat storage and fishing station." A cover letter for this lease, dated July 1, 1959 (Def.Ex.401) stated that the premises to be leased was in Queens, Block 210, marsh land at the foot of West 20th Road. In connection with the July 1, 1959 lease, there is a memorandum in evidence dated August 12, 1959 (Def.Ex.B–402). The memorandum recites that the premises leased is "Foot of West 20 Road—Borough of Queens, Block 210—Lot marsh land." Of importance is the description of the size of the leased premises, which is set forth as "Space—200' by 200'." The memorandum also states that the "old agreements cancelled."

The next lease of this land is dated April 16, 1962 (Pl.Ex.27). The lessee is "Adele Schmitt D/B/A Adam's Fishing Station— Foot of West 20th Road" residing at "Foot of West 19th Road ... Broad Channel, Queens, N.Y." The premises were described as "Foot of West 20th Road" at "Block 210 Lot Foot of West 20th Road—Area 40,000 sq. ft." The premises were to be used for "boat storage in connection with fishing station." The rental was raised to $150 per month with a deposit of $300. Like the one that preceded it, this lease was a month-to-month rental. There are no leases in evidence between the City and the Schmitts for land in Block 210 or "at the foot of West 20th Road" subsequent to the 1962 lease. Approximately three years later, in 1965, Adele retired. Adam and Ernestine, his wife, took over the Schmitt boatyard. In a bill of sale dated July 5, 1965 Adele sold "a certain business" located at the foot of West 20th Road, known as Adam's Fishing Station to Adam and Ernestine (Def.Ex.B–39). The bill of sale also assigned to Adam and Ernestine the lease of the fishing station and boat storage yard.

At the time of the Gateway conveyance, on March 1, 1974, (Pl.Ex.5), the 1962 month-to-month lease by the City to Adele was still in effect. The lease encompassed the foot of West 20th Road, Block 210, covering an area of 40,000 square feet of waterfront land with dimensions of 200 feet by 200 feet. Indeed, this lease arrangement, which commenced in 1959, remains in effect to this day. The only changes in the terms and conditions of the successive month-to-month leases were increases in the monthly rent from $134 per month in 1959 to $229 per month at the present time, an astonishing bargain for 40,000 square feet of waterfront property (*see* Pl.Ex. 27, City Ex. DO). It is conceded that no part of this original 40,000 square feet of the Schmitt leasehold is on Gateway property.

Also in evidence with regard to the Schmitt Marina leased premises at Block 210, is a letter dated May 19, 1980 from the City to the tenant of Block 210, lot 99 (Def.Ex.B–50). The letter notes that the "lease with the City dated May 1, 1975 for the property referred to above expired on

April 30, 1980." The letter refers to "an interim measure" during negotiations for the sale of Broad Channel by the City to the residents, and states that the City renews the lease term for an additional one year period from May 1, 1980 to April 30, 1981, with a 50% increase in rent, and no other changes in the lease provisions.

The Schmitt Marina eventually developed into what was described as "the largest and most substantial marina in the Broad Channel area," with a capacity of 250 year round boats (Def.Ex.00). The manner in which the Schmitt Marina developed and enlarged its areas is a key issue in this case.

### (2) *The Orean Leases*

Also relevant to this controversy are the leases by the City to John Orean. The first such lease in evidence is dated July 1, 1959 (Def.Ex.B–407). It lists John Orean as tenant, with his residence office at 73 West 19th Road, Broad Channel, New York. The premises leased are at the "Foot of West 19th Road," Block 209, lots 64, 66, 68, 72, 76, 78, 80, 82 and parts of 19th Road. This property apparently was adjacent to, and north of, the Schmitt Marina and also includes a residential area (*see* Def.Ex. B–408). The premises were to be used for "boat storage and fishing station" and the rent was $93.75 per month on a month-to-month basis. The leasehold is apparently known as "John's Fishing Station." There is also a part of a lease in evidence dated May 1, 1963 between the City and Orean, residing at 63 West 19th Road covering land in Block 209 (Def.Ex.B–408). On November 25, 1965, Orean assigned his "business, buildings, equipment and home" to his grandson Daniel Pasienza (Def.Exs.B–409, B–410). On April 20, 1968 Pasienza sold "John's Fishing Station" located at Block 209 to Adam and Ernestine (Def.Ex. 41).

### (3) *The Adam Schmitt Leases in Block 209*

The third set of leases in this case concern an area in Broad Channel leased by Adam. The first such lease is dated June 15, 1973 (Def.Ex.B–503) for land located in Block 209, lots 52–62, and containing "approx. 15,000 sq. ft." to be used for the "storage of private boats." The rental charge was $60.00 per month on a month-to-month basis. The second lease in evidence involving this land is dated July 21, 1975 (Def.Ex.B–54). The description of the premises and the terms are the same as the June 15, 1973 lease.

Also in evidence is a May 1, 1969 lease between the City and Adam and Ernestine Schmitt covering the land at Block 209 lot 74 for a five year period at the rent of $100.00 per month. This lease covers the use of the property as a private dwelling. In 1988, the City sold this land to Adam. The sale of the property by the City was based on the use of this property for residential purposes.

## II. *THE PROCEEDINGS AT ISSUE*

### A. *The Federal Court Action*

This Federal Court action was commenced by the plaintiff United States in June, 1989. The complaint named defendants Adele Schmitt, John Schmitt and Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, as well as Adam Schmitt d/b/a Adams Fishing Station. Also named as a defendant was Carl Mednica, individually and as president of Cave Diggers, Inc.

The federal complaint alleged eight causes of action against all defendants, seeking various relief including: 1) a judgment declaring that defendants are trespassing on the plaintiff's property; 2) an injunction against the defendants from trespassing on the plaintiff's property; 3) monetary damages for the defendants' alleged use and occupancy of plaintiff's property; 4) a judgment declaring that defendants are violating 33 U.S.C. § 403 (The Rivers and Harbors Appropriation Act); 5) an injunction preventing defendants from operating a marina and requiring the defendants to remove the marina operation from the plaintiff's property; 6) a judgment declaring that defendants violated 33 U.S. § 1344 (The Clean Water Act); 7) an injunction preventing the defendants from discharging fill into navigable waterways and requiring the defendants to remove the condition allegedly caused by the defendants' unlawful discharge; and 8) monetary damages for the defendants' alleged trespass on plaintiff's property.

The Schmitts interposed an answer, denying the allegations in the complaint and setting forth fourteen affirmative defenses. The defendants Carl Mednica and Cave Diggers, Inc. appeared in the case and participated in the 1989 and 1990 preliminary injunction hearings. Their attorneys were relieved by order of this Court in December 1992. Thereafter, Carl Mednica appeared *pro se* at the trial on August 30, 1993, but has not participated in any subsequent proceedings.

In March of 1993, the Court permitted the Schmitts to commence a third party action against the City of New York raising, among other things, the effect of the Gateway Conveyance on the issues in this case. The Schmitts seek a judgment declaring that they were lawfully leasing he property they occupy on Broad Channel Island from the City and have a right to purchase that property from the City. They also request that the Court redefine the property included in the 1974 Gateway transfer from the City to the United States, which, by its terms, excluded all portions of the "Broad Channel Community." Further, the Schmitts seek a declaration that the property leased by the Schmitts is not included in the property transferred by the City to the Federal Government under the 1974 Gateway Conveyance.

In response to the Schmitt third-party action, the City interposed an answer consisting of six affirmative defenses. Three counterclaims also were asserted, seeking: use and occupancy compensation from the Schmitts for the property they leased from 1945 to date; a judgment directing the Schmitts to restore the property and remedy any alleged damage caused by their occupancy and actions; and a judgment restoring the City to possession of the subject real property.

In July 1996, the Court granted permission to the Schmitts to serve a supplemental third-party complaint against the City, pursuant to FRCP 15(d), based upon the enactment of a new statute by the New York State Legislature in 1995. The City answered this additional third-party cause of action and asserted another counterclaim for damages.

### B. *The State Court Action*

In June 1990, after receiving thirty-day notices from the City attempting to terminate their tenancy as of June 30, 1990, the Schmitts commenced an action in Supreme Court Queens County in the nature of a declaratory judgment to void the thirty-day notices and to compel the City to sell the leased property to them pursuant to the authority in Ch. 756 of the laws of 1973 and the 1982 Resolution 151 of the Board of Estimate.

In the Supreme Court Queens County action, the Schmitts obtained an injunction staying the termination of their tenancy and directing that the status quo be maintained. On the City's motion to dismiss, the State Supreme Court, (Hentel, J.), dismissed the Schmitts' claims that sought a Writ of Mandamus compelling the City to convey the leased property to the Schmitts. The Supreme Court converted the action into an Article 78 proceeding to determine if the City's actions were arbitrary and capricious. By stipulation, the Article 78 proceeding was removed to this Court and consolidated with the Federal actions.

### III. *THE PRELIMINARY INJUNCTION HEARING*

After a ten-day hearing which concluded on February 16, 1990, the Court rendered an oral decision, later issued in writing, enjoining the Schmitts from putting any craft into a sheltered water area adjacent to the Schmitt Marina, known as the Cove. *United States v. Schmitt*, 734 F.Supp. 1035 (E.D.N.Y.1990). The parties, including counsel for defendant Mednica, agreed that all testimony at the preliminary injunction hearing "is deemed admitted in evidence at any future trial." Therefore, the Court will consider the evidence at the preliminary injunction hearing in its determination of the issues in this plenary trial.

Dr. John T. Tanacredi, a research ecologist and Chief of the Division of Natural Resources and Environmental Compliance at the National Park Service at Gateway, testified that Jamaica Bay is operated as a wildlife preserve and a haven for a multitude of fish, animal and floral wildlife. He stated

that the Schmitt Marina is located in the Big Egg Marsh which is a "protection zone." The Schmitt Marina consists of a land area, floats, floating docks and support structures, and has a capacity of approximately 250 boats. There were a number of floating docks and a walkway in the Cove. Dr. Tanacredi testified that the operation of the boats at the Schmitt Marina did and will contribute to polluting the environment in Jamaica Bay by the use of gasoline, sewage and waste products. He provided detailed testimony regarding the adverse impact on the ecology of the inter-tidal marshes and wildlife in the area of the Schmitt Marina as a result of the use and mooring of boats at the Schmitt Marina.

Dr. Arthur LaPerriere, an ecologist employed as Chief of Harbor Supervision, concurred with Dr. Tanacredi's opinion that ten acres of natural tidal marshland had been destroyed at the Schmitt Marina since 1976. Also, he stated that, as a result of the Schmitt Marina, these marshland acres were covered with construction debris. The Marina also discharged toxic pollutants into the navigable waters of Jamaica Bay. Dr. LaPerriere testified that the operation of the Schmitt Marina had an "adverse impact on the wildlife" in Jamaica Bay.

Michael P. Flynn, a lifetime resident of Broad Channel who worked at the Marina, testified about how the Schmitts placed more and more floating docks and boats in the Cove throughout the years. He described the two riprap walls that were built by the Schmitts. Flynn saw Adam using a bulldozer to push riprap to the northwest corner of the Marina. One of the riprap walls the Schmitts constructed was built in 1976–1977 in a semi-circle on an area partially surrounding the Cove known as the Hook. Adam talked to Flynn in 1977 or 1978 about extending the riprap wall. This wall was made of broken concrete, and its function "was to protect the marina from storms . . . (and) to prevent storm damage" (PI Tr. at 547).[3]

Daniel Turbidy, another long time resident of Broad Channel, saw garbage trucks dumping industrial waste in the Schmitt Marina area, usually after 10:00 p.m. The trucks heaved this waste onto the green marshlands surrounding the Cove. Turbidy also saw bulldozers spread the garbage and place dirt and rocks over it.

John Burke, an environmental conservation officer for the New York State Department of Environmental Conservation ("DEC") testified that on November 19, 1984 while on routine patrol, he saw that a new breakwall had been built. During a conversation with John Schmitt on the same day, John admitted that he was responsible for building the breakwall, and for the backfilling (PI Tr. at 1195–1196).

John Schmitt testified that there was no written assignment of the lease of the Schmitt Marina from his father Adam to him. He is not the named tenant on the lease and is presently the manager of the Schmitt Marina with the permission of his father. John denied that he personally dumped on or filled in tidal wetlands. Significantly, he testified that the Schmitt Marina had no known or definite boundaries, no site markers and only unfixed, indefinite boundaries (PI Tr. at 1362).

In its decision, this Court determined the following:

(1) The evidence admitted at the hearing clearly demonstrated that the government has shown a likelihood of success on its claim that the Schmitts violated the Rivers and Harbors Appropriation Act, 33 U.S.C. § 403, with regard to the docks, floating docks and the walkway located in the Cove adjacent to the Schmitt Marina. In fact, in their post-hearing memorandum, the Schmitts stated that "there is no objection to that portion of plaintiff's motion that seeks to enjoin or restrain" the Schmitts from " 'filling of tidal wetlands,' " although they deny that they have previously done so. (Schmitts' Post–Hearing Memorandum at p.1).

(2) The government demonstrated a likelihood of success on the merits that the Schmitts violated the Clean Water Act, 33 U.S.C. § 1344, in that they polluted navigable waters of the United States.

---

3. PI Tr. means transcript of the preliminary injunction hearing.

(3) Irreparable harm is presumed where the Government seeks to enforce a statutory violation by way of a preliminary injunction expressly authorized by that statute. Further, the Court found that the Government proved irreparable harm with regard to the detrimental effect of the operation of the Schmitt Marina on the diverse ecology in the Cove and the damage caused to the marshlands and waters as a result of the construction of the riprap wall. The Court stated that "Clearly money damages cannot compensate the citizens of the United States for the loss of vegetation and marshland in the Schmitt Cove." *Id.* at 1054.

4) "The Government cannot be estopped from prosecuting its Rivers and Harbors Appropriation Act and Clean Water Act claims" *Id.* at 1056; the doctrine of laches is unavailable to the defendants as a defense *Id.* at 1057; and the Schmitts failed to establish a defense of selective enforcement *Id.* at 1057.

Based upon these finding and conclusions, the Court issued the following preliminary injunction:

(1) the defendants John Schmitt, Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, and Adam Schmitt d/b/a Adams Fishing Station are hereby preliminarily enjoined from placing or allowing the docking or storage of boats in the Schmitt Cove (*see* Plaintiff's Exhibit 3) until further Order of this Court; and

(2) the defendants John Schmitt, Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, and Adam Schmitt d/b/a Adams Fishing Station are hereby preliminarily enjoined from any further expansion of the Schmitt Marina into the Schmitt Cove or any portion of Jamaica Bay until further Order of this Court.

Following the issuance of the preliminary injunction, the parties modified the terms of the preliminary injunction, on consent, to permit the Schmitts to use one single dock in the Cove below the mean water parallel to the mapped 96th Street in a north-south direction for docking and boat storage. This dock is referred to in this opinion as "Dock A." Also permitted was a second smaller float approximately 20 feet in length and 10 feet in width, a few feet seaward of and parallel to Dock A. The parties further modified the preliminary injunction in a stipulation on the record on April 29, 1994. (*See* Tr. 1838–1843, subject to certain concerns by the City regarding environmental problems; *see also* problems in connection with this stipulation at Tr. 1860–1901).

## IV. *THE TRIAL—FINDINGS OF FACT*

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Rosen v. Siegel,* 106 F.3d 28, 32 (2d Cir.1997); *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

### A. *The Schmitts' Case*

The Schmitts offered the testimony of two expert witnesses seeking to establish that any docks placed in the Cove prior to 1968, could remain without a written permit. One expert witness, James Haggerty, Chief of the Eastern Permit Section of the Army Corps of Engineers, testified by deposition with regard to "nationwide permits." A Nationwide Permit is a general permit issued from headquarters in Washington, authorizing "many types of minor activities without going through a full blown permit process." There is another type of permit called a "grandfather" permit which provides that no permit is required for any completed structure built in navigable waters prior to December 18, 1968. Thus, a dock placed in navigable waters prior to December 18, 1968 would need no permit from the Corps of Engineers.

The second witness, James M. Mansky is an expert in ecology, and was formerly Chief of Compliance Section of the New York District of the Corps of Engineers. Mansky also discussed the issue of Nationwide permits. He testified that a Nationwide Three Permit authorizes the repair and rehabilitation, without a written permit, of a structure that was constructed and placed in the water prior to December 18, 1968.

THE COURT: If there are docks into the water before 1968, you say they could stay there without a permit?

**330**

THE WITNESS: That's correct.

(Tr. at 96).

Mansky testified that he visited the Schmitt Marina on June 5, 1993 and again on August 29, 1993. In Mansky's opinion, three portions of the Schmitt Marina qualify for a Nationwide Three Permit: (1) the bulkhead close to the house, (2) the fill behind the bulkhead, and (3) the long dock with slips for boats parallel to the shore adjacent to the bulkhead, in the Cove. This permit would also cover a same size, same place replacement dock and the use of the dock to tie up boats. However, Mansky also stated that the other docks perpendicular to the main dock or walkway would not qualify for the Nationwide Three Permit.

According to Mansky, at the time of his visits to the scene, "the marsh and the site animals within the marsh were surviving and functioning within the normal condition and it did not appear that there was anything that the marina was causing as a disturbance." The Court does not credit this testimony. The overwhelming evidence is to the contrary.

During his visit, and after reviewing aerial photographs, Mansky observed "filling in" that took place in the Hook around the Cove over a two acre area. Mansky testified that he saw "fill in the Hook area" extending from the south and curving around the Cove shoreline. He stated that the filling of the Hook could have been done by dump trucks. Of importance, he observed asphalt in the fill area around the Cove and a substantial change in the vegetation along the shoreline. In sum, Mansky testified that there was significant filling in the Hook with two acres of fill which would be a violation of the law. (Tr. at 287–288, 309).

Mansky also testified that the Corps of Engineers had jurisdiction to the mean high water line and could not be deprived of jurisdiction because the area was filled in. In addition, he bolstered the Government's contentions that the Big Egg Marsh is vital to national wildlife abounding in Jamaica Bay:

Q Now, Big Egg Marsh, isn't it true that the marsh play a role in the food chain production of the estuary, Jamaica Bay?

A Yes.

Q Isn't it fair to say that the wetlands that were all around the marina in 1967 as clear from that photograph, they also played a part in food chain production, didn't they?

A Yes, they did.

Q And what about general habitat and resting, spawning, rearing and nesting sites for aquatic or land species? Isn't it true that small fish tend to hid in the grasses, in the Spartina at the high tides to prevent them from being eaten by the larger fish?

A Yes, they do.

Q Isn't it true that birds are generally shy, and if there is an area that they can nest that is protected by grasses, high grasses, that they may use it for spawning and nesting; is that true?

A Fish spawn and birds nest.

. . . . .

Q And they also provide resting sites for aquatic and land species? Don't these—

A Yes, they do.

. . . . .

Q And isn't it true that Jamaica Bay is place where all species of birds stop by on their way in the fall and in the spring? It is a stop over area?

A It is a stop over area.

Q Isn't it true that those grasses as they existed in Exhibit 39, that 1967 beach erosion photograph, isn't it true that those grasses around the marina, isn't it true that they could have easily provided resting sites for various birds and stop over points for various birds?

A Yes.

Q You would expect birds to be there?

A They could be there.

Q *They are not now because it has been buried with concrete?*

A *They could be off shore where the wetlands were before, but you would not tend to find them on top of the fill.*

. . . . .

Q And tomorrow it is supposed to rain, heavy rain tomorrow. If that piece of asphalt is sitting down in that cove, isn't it true a little may trickle off and leach down into the area?

A It's true.

. . . . .

Q *So you don't build normal streets through marsh land if you want to protect it for the animal life, isn't that true?*

A *You would not normally put asphalt on top of a street with marsh land.*

. . . . .

Q Okay.

Is it fair to say that it was a wetland set aside for study of aquatic environment or as sanctuaries or refuges, isn't that exactly what Big Egg Marsh is?

A As depicted on this map, yes.

(Tr. at 246–253) (emphasis supplied).

Significantly, Mansky testified that the marsh islands of Jamaica Bay are "unique":

Q Isn't it fair to say that the marshes— the marsh islands of Jamaica Bay, which are part of the wildlife refuge, isn't it fair to say that they are unique in terms of their lack of development inside of the borders of New York City?

A Yes.

Q Isn't it fair to say they are scarce in New York City this kind of wetland and bird habitat?

A Yes.

(Tr. at 256–257).

Further, Mansky testified, after some evasion, that the boats in the Schmitt Marina did do some damage to the wetlands. (Tr. at 259).

Mansky testified in June and August 1993. On August 3, 1995, Mansky was recalled by the Schmitts. In his initial testimony, he was of the opinion that Dock A and a bulkhead were authorized under a Nationwide Three Permit. In his 1995 testimony, Mansky asserted that the Schmitts also were entitled to a Nationwide Two Permit under the provisions of 33 CFR § 330.6(2). This provision, in effect since 1988, authorized structures constructed in artificial canals in residential areas where the connection of the canal to navigable waters had been previously authorized. Thus, according to Mansky, the Schmitts can place and maintain any structure they want in an artificial canal. In Mansky's opinion, the Schmitts are entitled to a Nationwide Two Permit because there the Cove is an artificial canal in the Schmitt Marina area.

Mansky also testified, after reviewing the applicable maps and aerial photographs, that he concluded that the Cove was created between 1924 and 1938. Also, the water depths around Broad Channel vary from 2 feet to 11 feet, while the depth of water in the Cove is 16 feet. He then deduced that the Cove was created by dredging the area and was a man made artificial canal. According to Mansky, nature could not have made a 16 foot deep cove surrounded by shallower water. Mansky's conclusion is that the Cove is an artificial canal and the structures within the Cove are authorized by a Nationwide Two Permit, as long as the structures did not have a significant impact on navigation. As such, according to Mansky, the Schmitts do not need written authorization from the Army Corps of Engineers to maintain the docks in the Cove. He also stated that the docks in the Cove do not "appear" to impede navigation, although he admitted that a dock in the Cove would be an obstacle to navigation. However, he later reversed himself and contended that the Schmitt Marina docks had no effect on navigation.

Notwithstanding Mansky's view that the Cove was a "canal," he conceded that the Cove area is always reached by the sea and was formerly marshland. He also stated that a Nationwide Two Permit refers to a "residential development." In an 1896 map, the Big Egg Marsh was not a residential neighborhood (Pl.Exs. 48 and 49). In a 1923 sketch, it is apparent that the Cove was in the area of Big Egg Marsh that was not developed. In 1988, hundreds of boats were stored on the land near the Cove, which is a commercial use (Def.Ex.B–151). With regard to this claim that the Cove was a canal, John Schmitt brought in hundreds of documents on Broad Channel and stated that he could not produce a single map that referred to the

Cove as a canal. The Court finds that the Cove is not in a "residential development," is used in a commercial enterprise, and thus would not be subject to a Nationwide Two Permit.

Thomas C. Monaghan is an attorney who resides and has his office in Broad Channel, a mile north of the Schmitt Marina. He grew up in Broad Channel. The Court finds that Monaghan exhibited a definite bias and hostility against the City of New York. Monaghan testified that after 1975, no written leases were issued by the City. From that time, the City kept the tenant's name and leasehold on a computer, under block and lot numbers, with monthly bills issued by computer. He testified concerning the sale of the land in Broad Channel by the City to the tenants, commencing in 1981. Starting in the 1970s, one Ed Smith was in charge of the leases on Broad Channel. Surveys with regard to the sale of the property on Broad Channel were done by Albert A. Bianco, although many closings were consummated without surveys. The descriptions in the deeds were based on the streets in Broad Channel and not on metes and bounds. Some persons were permitted to buy properties in addition to their leased premises. The original sales were only for residential property. However, starting in 1984 or 1985, sales of non-residential parcels commenced.

Monaghan is familiar with the Schmitt property and the surrounding areas. He stated that the Pasienza property, formerly known as John's Fishing Station, is immediately adjacent to the Schmitt property. Both lessees were engaged in operating a marina and fishing station. The Schmitts occupied the Cove (he referred to that location as the cul-de-sac) with moorings where boats were docked. Both marinas were on land at the end of 19th Road; John's Fishing Station on the north side and the Schmitt Marina on the south side. John's Fishing Station also used the canal north of 19th Road to store rowboats.

Monaghan testified that the City sold properties to certain tenants which were fishing stations and marinas, but the City declined to sell to the Schmitts. Monaghan believed that the Schmitts were the only Broad Channel residents not given this opportunity by the City to buy their leased property.

According to Monaghan, the entire Broad Channel area, comprising the entire boot including Big Egg Marsh and the Cove, is excluded from the Gateway Conveyance. (*See* markings on Def.Ex. B-19). The Court does not credit this unreliable lay opinion testimony and finds that the portion of Broad Charnel excluded from the Gateway conveyance does not include the Big Egg Marsh and the Cove.

With regard to the fill added to the Hook, Monaghan testified, as follows:

Q Didn't there come a time there was some kind of alteration in the area we call the Hook? Did you ever see that change?

A Yes.

Q And what happened to it?

A It was built up.

 . . . .

Q How did it change?

A There was fill, there way land where marsh used to be.

Q Did you have any understanding of how that fill arrived on to the Hook?

A I never actually saw any trucks actually dumping. But I know that obviously they did.

(Tr. at 806–807).

Interestingly, Monaghan testified that almost all the tenants on Broad Channel encroached on City-held property. Indeed, a substantial number encroached on more than 100 percent of the land they leased and a few encroached on 200 to 1200 percent of the land they leased from the City. Monaghan defined the term encroachment to mean that tenants "expanded their property as far as they could go without offending an adjoining property owner."

The Court was not impressed with the testimony of Monaghan. He is clearly overly anxious to assist the Schmitts and his testimony as to the various boundary lines appears tailored to follow the "Fruchtman line," explained below, that the Cove and Hook are excluded from the Gateway conveyance.

Irwin Fruchtman was an important witness for the Schmitts. As Chief Engineer of the City Planning Commission he prepared the map for the Gateway Conveyance. Fruchtman worked with the mapping division and other City agencies to draw the lines for the Gateway conveyance. The final map, dated January 11, 1974, contains his signature.

Fruchtman testified that the Broad Channel Community was excluded from the Gateway conveyance. Also excluded were three of the four proposed City parks, that were never adopted. According to Fruchtman, the Big Egg Marsh also was excluded. (*See* Def.Ex. B–20). Fruchtman also testified that the Broad Channel Community "is bounded by three of [the] four proposed parks." The words "bounded by" are important in the determination of some of the disputed issues in this case.

Also material to the question of the Gateway Broad Channel exclusion is the shading on the conveyance map, Def.Ex. B–19. The shaded areas were not to be conveyed to Gateway. Fruchtman conceded that none of the so-called park areas are shaded on the map. This important map, Def.Ex. B–19, showing the shaded portion of the Broad Channel not to be conveyed to the Federal Government for Gateway is in the Appendix at Figure 2. The Court finds that the Big Egg Marsh, including the Cove and the Hook around the Cove, *were included* in the Gateway conveyance. Accordingly, the Court finds that title to those lands, water and lands under water is, since 1974, in the Gateway National Park.

Adam Schmitt has lived in Broad Channel since 1936, when his parents acquired a house and land. In October 1944 his family purchased a houseboat on land at the foot of 20th Road that the Schmitt family occupied (*see* Bill of Sale, Def.Ex. B–33). His parents, Adam and Adele, are deceased. Adam took over the marina in 1965, and then lived there with his five children. Adam has a second residence on Broad Channel. In 1982 he moved into the house on the adjacent John's Fishing Station.

Adam described Schmitt's Marina as it was in 1944. At that time there was a small sand road "more or less" going to the marina and "there wasn't much land being used at the time." (Fr. at 713). Adam's initial description of the growth of the Schmitt Marina reveals how, over the years, the Marina kept expanding:

THE WITNESS: There was a small road going to the marina and there wasn't much land being used at the time. And over the years my father kept adding to it. *There were many leases that he added here, added there, added here, added there. And it kept going.*

Then in 1968 I bought what was called— it was called John's Fishing Station. I bought it from Dan Pasienza.

So, in effect in 1968 the marina encompassed from the 19th Road canal south almost over to the day camp.

. . . . .

And including the cove, the water in the cove. There was one lease that specifically mentioned 40,000 square feet of water.

(Tr. at 713–714) (emphasis supplied).

In 1944, there was a small dock in the water parallel to the land. (*See* Def.Exs. W, X and Y). This small dock remained in approximately the same location, to the present date. Also, the bulkhead near the dock is, except for repairs, substantially the same since 1944. The bulkhead runs in a north/south direction for approximately 200 feet in length.

When Adam took over the marina from his parents in 1965, the bill of sale from Adele dated July 5, 1965 (Def.Ex.B–39) described the "business" being sold as "located at the foot of West 20th Road," the same location as in the City leases. The bill of sale described the nature of the business "as a fishing station and boat storage yards." There is no mention of a "marina" in the bill of sale.

Adam testified that the lease from the City included the entire Cove and the land south to the Broad Channel Day Camp. Using a copy of the aerial photograph taken on August 8, 1984 (Pl.Ex.3) and a marker, Adam drew an orange line showing his view of the boundary of the Schmitt Marina. (Def.Ex.B–40). (This exhibit is designated

as Figure 3 in the appendix). (Editor's Note: Appendix not reproducible for purposes of publication.) In delineating his view of the borders of the Schmitt Marina, Adam includes the Cove and the water north of the Cove, but carefully excludes the Hook around the Cove. He also includes a large portion of the land east of the Cove.

In 1968 Adam expanded his holdings by purchasing John's Fishing Station, located adjacent to and north of the marina. Adam drew a yellow line on the map show his view of the location of the John's Fishing Station property (Def.Ex.B–42). The Court notes that Adam's view of the location of John's Fishing Station portrays a much smaller piece of land due north of the Schmitt Marina with little water surrounding it. (This exhibit is designated Figure 4 in the Appendix). (Editor's Note: Appendix not reproducible for purposes of publication.)

According to Adam, dumping of fill took place at John's Fishing Station in 1968 and 1969. The fill consisted mostly of concrete from the bridge being rebuilt on the Cross Bay Boulevard, with sand piled on top of the concrete. Adam did not know who dumped this fill on the John's Fishing Station property. The purpose of this fill was to "stabilize the land and raise it above the moon tides." (Tr. at 989). In 1982 Adam retired and turned over the marina to his son John. Adam was also the owner of Channel Marine Sales, which he apparently operated at and in conjunction with the marina. In 1988 Adam purchased his residential property from the City (Def.Ex.B–45).

Adam stated that the Hook was not part of the Schmitt Marina. He did not know who owned or leased the Hook property. Adam contends that the Schmitt Marina lease includes the water in the Cove, but not the land around the Cove known as the Hook. Adam denied that he or any member of his family "put the fill on that portion of the area known as the hook." (Tr. at 1005). This raises one of the important issues in this case, namely, who was responsible for filling in the marsh land around the Cove, which fill, dumped on top of the green marshland, created the riprap brown-appearing Hook?

Adam testified that Carl Mednica is a contractor and a customer who kept a boat in his marina. Adam first met Mednica in 1973 when he stored his boat at the marina. Curiously, Adam did not charge Mednica for storing his boat. He explained that the boat "never went in the water so I never charged him," and "we got to be friendly." (Tr. at 1014). Asked who was responsible for filling the Hook, Adam responded that he saw different trucking companies dumping on the Hook, and he saw Mednica with a bulldozer. He also saw Edward Smith, the City Broad Channel land manager "talking to the different truck drivers, who were dumping the fill" in "the whole area of the hook." (Tr. at 1006).

During his testimony, Adam described the filling in of the Hook:

Q Now, leaving aside rip-rap, because we will get to that, what you meant rip-rap then, but your testimony was that you didn't own the Hook; is that correct?

A Yes.

Q And that little parcel of land at the end of the Hook is the furthest projection of the Hook?

A The fill was—Hook was filled in land. It was marsh. It was a continuation of marsh around the cove.

Q What year are you talking about that the Hook was marsh?

A Filled in in 1973, 1974.

Q Prior to 1973, 1974, the Hook was marsh land?

A Yes.

Q And the tides occasionally reached over the marsh?

A Yes.

(Tr. at 1023–1024).

Adam explained that he did not want to build up the Hook to protect the boats in the Cove because the winds and bad weather come from the northwest and building up the Hook, which is in the south, would not make any difference. Adam denied that he was associated with Mednica in any manner with regard to filling in the Hook, nor was it done on his behalf. In fact, Adam testified that he tried to block the dump trucks from coming on his land. He did permit dumping on his

property but not on the Hook. He also used Mednica's bulldozer in "knocking the weeds down." Also, Mednica stored equipment on the Schmitt Marina, including two olivers, a dump truck, a flatbed trailer with equipment, a bulldozer in pieces, and several fuel tanks. Adam also conceded that, at one time, he worked for Mednica, "pushed snow for him with a bulldozer;" knew how to operate Mednica's bulldozer and this bulldozer was "sitting" on his property, in pieces.

Adam conceded that he knew Mednica was dumping fill around the Hook:

Q Did you ever say to Midnica (sic) that you would like to have fill put in around that Hook to close in the area to prevent storm damage? Did you ever say something like that to Midnica (sic)?

A No.

Q Is there any reason why Midnica (sic) would believe that you wanted him to do that?

A Not that I know of.

Q He did it though, didn't he, Midnica?

A Yes.

Q You knew he was doing it at that time?

A Yes.

Q And you didn't object to it, right?

A By that time I had objected.

(Tr. at 1094).

Adam also admitted that someone visited him from the federal government and told him that he was filling in federal land. Also, his testimony on the erosion on the Hook and the filling of the area by way of a riprap wall in 1976 and the protection of the boats in the Cove is enlightening:

Q ... Isn't it true that someone from Floyd Bennett Field came to visit you and told you that part of your marina is on—

A At one point they did, yes, that's correct.

．　　　．　　　．　　　．　　　．

Q Is it correct that there had been erosion in that end of the Hook, and that erosion had made the cove more vulnerable to wave action from the bay?

A Somewhat.

．　　　．　　　．　　　．　　　．

Q So this person is right again, that building a rip-rap wall in the right place would have prevented erosion and protected the boats in the marina; isn't that true?

A Yes....

(Tr. at 1144, 1146, 1148–1149).

On October 5, 1976, the Corps of Engineers sent a "cease and desist" letter to Ernestine Schmitt, Adam's wife, regarding the filling of material "upon the wetlands adjacent to your property" (Pl.Ex.18). This letter referred to the placement of fill material upon the wetlands "adjacent to your property," and that such fill was detrimental to the surrounding environment. The letter requested her to remove all the fill material, and warned that failure to comply would result in forwarding the case to the United States Attorney for appropriate action.

The Court finds that the Schmitts were warned about the very conditions at issue in this case, as far back as October 5, 1976, and chose to ignore all the warnings. Not only did they do nothing to rectify these conditions, but they exacerbated the situation by continuing to fill in the Hook area around the Cove and by increasing the docking facilities in the Cove.

At this point in the trial, the Government and the City stated their contentions as to the land and water claimed by them to be part of the Gateway acquisition and thus under the control of the United States.

THE COURT: Is it the Government's contention that this area here, marked was not conveyed?

MR. CLEARY: Yes.

THE COURT: And you say the area including the cove was? (Was conveyed to Gateway).

MR. CLEARY: Yes.

THE COURT: And was there any area in the ground part conveyed?

MR. CLEARY: The marshes.

THE COURT: But where Schmitt's Marina is?

MR. CLEARY: The line runs right along the shore.

THE COURT: I am getting to the heart of the case now.

. . . . .

Your contention is it ruts along the shore here?

MR. CLEARY: *Yes, and includes the cove and includes the marsh land.*

. . . . .

MR. SHAW: It is the City's contention as well, but I would like to define it to the extent that it runs along the shoreline, except to the extent that the shoreline has been changed by the dumping and filling in that area.

(Tr. at 1335–1336).

Edward Weinstein is an architect and urban planner. He was formerly employed with the Corps of Engineers for four months and for 17 years with the City Department of Ports and Terminals. Weinstein is familiar with the City, State and Federal regulations involving the areas and issues in this case. Weinstein was retained by the Schmitt Marina in June 1991 to apply for a permit for certain floating docks and bulkheads at the marina. He viewed the marina at that time and described it as five acres of upland and five acres under water. The land under water includes the Cove containing floating docks. There is one main dock approximately 250 feet in length running parallel to the shoreline (Dock A) and several other floating docks and finger piers.

Shown the August 8, 1984 aerial map (Pl. Ex. 3), he pointed out Dock A, the dock closest to and parallel to the shore. After having reviewed the photographs taken over a period of fifty years, Weinstein testified that "Dock A existed in just about every photograph I have seen of this property going back to the late 1940s."

Weinstein testified that Dock A would be entitled to a Nationwide Three Permit because it was a structure existing prior to December 18, 1968, providing there was no interference with navigation. He was also of the opinion that the bulkhead alongside Dock A would be entitled to a Nationwide Three Permit since it has been in continuous existence since the 1950s. This Nationwide Permit would authorize the maintenance, repair, renovation and rehabilitation of the structures. The Court notes that it could not find or observe the bulkhead referred to by Weinstein on any of the aerial photographs, although a snapshot taken in 1966 reveals what the Schmitts contend is the bulkhead (Def.Ex. B–76). Weinstein further testified that a Nationwide Twenty–Eight Permit authorizes the reconfiguration of marinas, and that the Schmitt Marina had both such permits. Under these permits the Schmitts "would have the right to fix the dock and bulkhead so long as it existed at that location in substance prior to that December 18, 1968 date."

In addition, Weinstein testified that all the docks in the Cove as shown in the August 8, 1984 aerial photo (Pl.Ex. 3) "can continue to exist and can continue to be maintained and repaired because they are authorized under the Nationwide Permit." (Tr. at 1374). Weinstein based this opinion on the fact that in the 1950s as shown in Def.Ex. W, the entire Cove was filled with small boats at moorings. He stated that "a mooring and a dock are interchangeable and serve the same purpose. And, therefore I feel the reconfiguration from a mooring to a floating dock is allowed in accordance with Nationwide Permit 28. . . . And therefore the change from having approximately 200 boats at moorings, to approximately the same number of floating docks is a reconfiguration permitted under Nationwide Permit 28." (Tr. at 1374–1375).

Also, Weinstein stated that the "work" in the Cove would have been permitted "in accordance with the after-the-fact procedures of the Army Corps of Engineers." He explained that an "after-the-fact permit" is a permit authorizing work which is begun or completed without an individual permit, where the work can be presumed to have been allowed under the Nationwide Permit. Weinstein concluded that because the activities in the Cove, including the placement of the floating docks, as well as the repair and rehabilitation of the bulkheads and shoreline structures were permitted in accordance with Nationwide Three and Twenty–Eight Per-

mits, therefore, they would have been approved with an after-the-fact permit.

Weinstein also concluded that the construction of the marina and the reconfiguration of the floating docks in the Cove "has absolutely no interference with navigation" and would be environmentally less obtrusive. He stated that this area of Jamaica Bay is not significant to navigation, in that it is an area "used exclusively for recreational boating and not for interstate or foreign commerce." However, Weinstein conceded that a pier could be an obstruction to navigation. The Court finds that a dock could also be an obstruction to navigation.

Weinstein testified that in June 1991, the Schmitts made application to the Corps of Engineers for a permit for the docks and bulkheads and "kept getting a run around." It took a year for them to obtain an application number, which was "extraordinarily unusual." Finally, he was told that AUSA Cleary had the file and so the application could not be processed.

Touching on a critical subject, after being shown Def.Ex. B–27, Weinstein stated that the Big Egg Marsh was within the Broad Channel Community and was not part of Gateway National Park. As stated throughout this decision, the Court rejects this unsupported opinion and finds that the Big Egg Marsh *is* part of the Gateway National Park.

The Court observes that Dock A was of different lengths over the course of the years. For example, in the aerial photograph taken on April 11, 1969 (Pl.Ex. 24) Dock A was about 50 feet in length (Tr. at 1464), while on May 3, 1969, there were a number of floating docks totaling over 200 feet (Def.Ex. 78). Also, the Court finds that 33 CFR 330, Appendix A limits the scope of Nationwide Twenty–Eight Permit, as follows:

> Modifications of existing marinas. Reconfigurations of existing docking facilities within an authorized marina area. No dredging, additional slips or dock spaces, or expansion of any kind within the waters of the United States are authorized by this Nationwide Permit.

Reviewing the aerial map of Broad Channel in 1969 (Pl.Ex. 24) and in August 1984 (Pl.Ex. 3), Weinstein declined to concede the obvious fact that there were additional slips or docks added to the marina during that period of time. His evasive conduct did not enhance his credibility. The Court finds that the Schmitts did add additional slips and dock spaces to the existing docking facilities in violation of 33 CFR 330. See Appendix A.

The credibility of Weinstein was also undermined by his refusal to admit the obvious, namely, that the unshaded portions of Broad Channel on the various maps, demonstrates that the Big Egg Marsh portion of Broad Channel was included in the Gateway Conveyance. (Tr. at 1481–1484).

Also, during Weinstein's testimony evidence was adduced that the Schmitts substantially increased the number of slips in the Cove between 1984 and 1988. In Pl.Ex. 3, the August 8, 1984 aerial photograph, there were approximately 130 boat slips in the Cove. In the aerial photograph taken on March 17, 1988 (Pl.Ex. 46) there were 184 boat slips in the Cove, an increase of 54 boat slips.

Frank Papay had been until September 1986 the Director of Parkland and Planning for the Department of Parks of the City of New York. He is familiar with the conveyance to the Federal Government for Gateway, since most of the land conveyed was parklands. He is also familiar with the "neighborhood" of Broad Channel. Papay testified that Broad Channel was excluded form the Gateway conveyance because it was the City's policy "not to disrupt or dislocate people ... the intent of Gateway was to convey basically wetlands, beaches and other parkland. And it was not the intent of the City to dispose of residential areas." (Tr. at 1564). Although offered by the Schmitts, this testimony supports the contention that the marshland which constitutes the Big Egg Marsh and the Cove *were* conveyed to the Federal Government for Gateway.

Also, Papay testified that it was the intent of Congress and the mandate of the Parks Department to protect the marshes of Jamaica Bay for migratory birds. He also stated that the residential area of Broad Channel ended where the Big Egg Marsh began; that the Big Egg Marsh was an undisturbed bird

habitat "since time immemorial;" and that it would be consistent with his understanding of the reasoning of the Gateway Act that the Big Egg Marsh be included in Gateway. (Tr. at 1650). On cross-examination by the Assistant Corporation Counsel, despite the vacillation by Papay, it became clear that Big Egg Marsh was conveyed to the Federal Government and was included in Gateway:

Q *Isn't it true, sir, that a considerable portion of the land within that boot shaped unhatched area was in fact conveyed to the federal government?*

A *Yes.*

Q *Including most of Big Egg Marsh?*

A *Yes.*

(Tr. at 1653).

Steven Goverman is an Assistant Regional Attorney of Region II of the New York State Department of Environmental Conservation ("DEC"). He was first involved with Schmitt's Marina in April 1992 in a proceeding by DEC against John Schmitt. In that proceeding by DEC John Schmitt did not attend a hearing and an order was issued by the Commissioner of DEC, "which required the payment of a fine of $22,000 and the performance of certain remediation at the Schmitt Marina site." In addition, "there was a finding by the administrative law judge, confirmed by the Commissioner, that the marina had been the subject of filling activities in a 100 by 100 foot area, and a bulkhead had been placed further out...." (Tr. at 1546).

Goverman testified at length as to documents and certain DEC proceedings against Cave Diggers, Inc. and Mednica, including a consent order. Action against these two parties was not enforced because Cave Diggers went into bankruptcy and Mednica was not "available." In one of the agreements Cave Diggers and Mednica agreed to remove fill within 18 months to below mean high water. There was no reference to the Schmitts in these documents and no evidence that they were actively involved. However, Goverman testified that the Schmitts may be involved in that the violation occurred on property that was under their control.

Goverman reviewed certain documents pertaining to a violation at the Schmitt Marina in November 1984 (see Def.Ex. B–104). The DEC Certificate of Disposition dated November 19, 1984 describes the offense as: "Placing fill which consists of wood, cement and brick on a tidal wetland and constructing a retainer wall in a navigable body of water." In a tidal wetland map annexed to the documents it is noted "fill, approximately ten yards by ten yards ... retaining wall 80 feet." The owner of the property is listed as John Schmitt, "leased from the City." The photographs annexed show a bulldozer and a crane. These demonstrate two discrete violations, namely, the fill and constructing a retaining wall in a navigable body of water.

Also offered in evidence was Def.Ex. B–107, which is a DEC form dated January 22, 1985 alleging the following violations: "Placement of fill consisting of dirt, wood, cement rubble, and brick into navigable waters and tidal wetlands, including a large area of intertidal and high marsh. Construction of a retaining wall in navigable waters and tidal wetlands. All activities done without the required D.E.C. permits." This violation apparently was placed after a personal visit by a DEC staff member. The DEC person also stated in the report that there was a "massive filling of one of the largest and best salt marshes in New York City." A notice of hearing for November 15, 1985 (Def.Ex. B–108) stated the violation at issue as follows:

Inspections of Respondent's premises made by employees of the Department disclosed that Respondent has placed or caused to be placed, fill, consisting of wood and soil, rubble and brick into hangable (sic) waters and tidal wetlands, and constructing a retaining wall in navigable wetlands and tidal wetlands of Jamaica Bay around Broad Channel and its adjacent areas immediately adjacent to its premises at 64 West 20th Street, a navigable body of water and mapped tidal wetland, in violation of ECL §§ 15–0505 and 25–0401 and 6 NYCRR. Parts 608 and 661 and without obtaining the required permits from the Department.

On April 14, 1988 another violation complaint was filed against Schmitt's Marina

(Def.Ex. B–117). The charge directed "removal of vegetation, storage of boats." The complaint further states that: "This is an ongoing violation site at which vegetation has been removed, tidal wetland filled, and solid waste disposed. (Note unresolved enforcement case on file for years)." On November 15, 1988 another notice of violation was filed against John M. Schmitt with regard to tidal wetlands. (Def.Ex. B–123). The charges was "Placement of fill and grading such fill in the adjacent area to a tidal wetland without a required permit."

An administrative hearing was held on the DEC violations on July 6, 1989 before Administrative Law Judge Susan J. DuBois. The Schmitts declined to attend the hearing after being notified by certified mail, and were in default. The Schmitts never moved to vacate their default or to reopen the hearing. In her Hearing Report dated October 11, 1990 (Def.Ex. B–128), Judge DuBois made numerous detailed findings including rock, concrete and dirt fill placed in tidal wetland areas containing marsh grass; the construction of additional docks by July 19, 1988; additional docks constructed by August 23, 1988; and other violations. A copy of the report is found in the appendix at Figure 5. Among the recommendations of Judge DuBois was to require the Schmitts to remove the bulkhead and fill and restore the wetland. On October 11, 1990 an order was entered by the Commissioner of the DEC approving the recommendation of Judge DuBois (Def.Ex. B–128A).

Goverman reviewed the 1974 and 1984 aerial photographs and noted the differences in the area of the Schmitt Marina. These differences included "possibly five or more docks that were not in existence in 1974;" a substantial fill in area directly behind the dock causing it to be unvegetated; the fill projected "fairly far out into the cove;" and very substantial and extensive "amount of filling in the area designated intertidal marsh along the hook of the cove." Goverman testified that presently John Schmitt is not in compliance with the DEC orders; no remedial work has been done; and the civil penalty of $22,000 has not been paid. According to Goverman, "this fill by the Schmitts is a seven acre fill, and in terms of gross area it does represent the largest filling violation within the five boroughs of the City of New York."

While the initial DEC investigation of the filling revolved around Mednica, there was evidence of involvement by the Schmitts. Goverman convincingly explained the reasons for his opinion "that the Schmitts were in part responsible for the fill, particularly around the hook area"

What makes this (the fill dumping) unusual here is it takes a long linear form which is labor intensive and spread over a very discreet area, and it is a very irregular sort of fill. And what that says to me is that it was done not for disposal purposes let's say, but for a construction purpose.

There is some cost and effort and equipment used that would be associated in creating a fill of this nature, meaning it is not the haphazard fill one would expect for fewer disposal purposes, but, rather, for construction purposes.

. . . . .

Q If the person was in the construction business and trying to dispose of fill—are you saying there would be no use to that person?

A In terms of equipment cost and time, it would make no use for the intended use, no. In terms of actual earth moving and grading and any other activities that might be associated—the scale of the fill would be out of proportion to that use.

THE COURT: So, you are saying that there is no use to the fill?

THE WITNESS: *The only use that would make sense, your Honor, is what Mr. Midnica (sic) was describing, and essentially access and the beginnings of a wall to shelter the marina.* That would be appropriate to the scale of this kind of fill.

(Tr. at 2366, 2370–2371) (emphasis supplied).

The Court has compared the various aerial photographs and by doing so, the evolution and the growth of the Schmitt Marina is readily apparent. The aerial photographs taken on April 27, 1946 (Def.Ex.161) and April 28, 1949 (Def.Ex.B–162) show no docks

in the cove. By contrast, the aerial photograph taken on April 19, 1954 (Def.Ex.B–164) shows the dock we now refer to as Dock A. Apparently, this is the first photograph which shows the presence of Dock A. By June 24, 1959 Dock A is busily used and there are boats and, perhaps moorings for the boats in the cove. (*See* Def.Ex. B–169). In Def.Ex. B–171, an aerial photograph taken on May 6, 1960, only Dock A is a permanent visible dock—the boats in the Cove appear to be attached to moorings in an irregular fashion, leading the Court to find that these moorings are *not* permanent structures entitled to a Nationwide Permit. Also, comparing a November 20, 1966 photo (Pl.Ex.23) with a March 17, 1988 photo (Def.Ex.B–151) one can see the substantial increase of docks and slips in the Cove. In 1966 there was one long dock parallel to the shore (Dock A), while in 1988 there are ten docks in various lengths in the Cove.

Portions of the deposition of Carl Mednica taken on October 14, 1993 were read into the record. Mednica testified that he purchased and docked boats at Adam's Fishing Station starting in 1973. He did not pay Adam a fee because they were very good friends. Mednica kept a big bulldozer and a "dynahoe" at the marina. He had an understanding with Adam so that he could use both machines. Mednica testified that Adam needed concrete in the form of broken sidewalk to stabilize the grounds. The broken concrete came from broken sidewalks and was dumped into containers. Mednica advised Adam how to spread the concrete over the land. Adam used Mednica's bulldozer with his permission to pulverize the concrete. The following deposition testimony by Mednica is material on the issue of who placed the fill in the area of the Hook:

Question: Did Adam ever tell you why he wanted this concrete put on this land, what purpose he had? Did he ever tell you anything?

. . . . .

MR. CLEARY: Answer: The purpose of the, you know, of the particular idea to put the fill in, because they wanted to construct a wall to the boats. It's like a breaker, a water breaker, so the boats will not be pulverized when the boats come in. You see that? You know, right here, a big wall supposed to be there, so the boats—

A Nor'Easter, so it hits the wall, so he would not pulverize the boats.

Question: So he?

Answer: The boats can be clear here and no damage.

Question: *Meaning inside the Cove? In other words, he wanted to create a safe haven inside the Cove for the boats?*

MR. WESTFAL: Objection, your Honor.

THE COURT: Overruled.

MR. CLEARY: Answer: *Right here.*

Question: *Indicating the Hook around the Cove; is that right, is that true?*

MR. WESTFAL: Objection.

THE COURT: Overruled.

MR. CLEARY: *Answer yes.*

(Tr. at 2300, 2301) (emphasis supplied).

Mednica also testified at the deposition that the filling and dumping of this area occurred in a short period of time, within one month to five weeks. He further stated that he did not know who was doing the dumping. The Court doubts the veracity of this latter statement and finds that the totality of the evidence including the photographs and documentary evidence compels the finding that the Schmitts, either directly or though an agent conducted the dumping and the filling in the Hook around the Cove.

Charles M. Neckers formerly was employed as an Assistant Commissioner in the City Division of Real Property from 1980 to November 1992. His duty was to oversee sales and leases of the City's surplus real estate. In the latter part of the 1980s the Broad Channel sales program was transferred to Neckers. The responsibility of his department was to manage the property, collect revenues from those who leased the property and eventually "to sell the (Broad Channel) properties to the existing tenants of record." With regard to the sale of the Broad Channel properties, his instructions were to sell the residential properties first, which involved 98% of the Broad Channel property. There were some commercial

properties "and they would be handled at the end." (Tr. at 3015). Because there was no accurate survey of all the properties leased to the "900 or so" tenants on Broad Channel, the Broad Channel Association hired a surveyor and had the property surveyed. The survey "sometimes included some adjoining property that was not leased to anyone." (Tr. at 2958). "And, if there was distance between another house, why have a sliver of city property between the two properties, let's split it and sell it to one or the two people on the side, so they can maintain it and they can own it." (Tr. at 2959).

Only preliminary appraisals were made of the Schmitt property. Neckers never saw a final appraisal of that property. However, Def.Ex. OO is a hand-written memorandum dated May 19, 1981 made by Charles R. Kamps, an appraiser. In this document it is indicated that the owner of Schmitt Marina sent a diagram of what he believed were the true boundaries. "It was felt that it (the Schmitt diagram) was fairly accurate although no formal survey was ever made." (Tr. at 2965). The same memorandum noted that "The land under water in this particular case is threatened by the federal government claim that it is part of the Gateway National Recreation Area and not owned by the marina." (Tr. at 3008). Also, the memorandum estimated the Schmitt Marina "as being approximately 226,000 square feet." (Tr. at 3021). Also in evidence is a letter to the Schmitt Marina from Assistant Commissioner Corrado dated May 20, 1981, which reads as follows:

We have reinspected the area that you diagrammed as being the site of the Schmitt Marina.

We have concluded that your diagram is generally correct as far as can be determined without a survey.

The total area occupied has been estimated to be 226,000 square feet.

The appraised value is still $234,000, (sic) and this valuation is slightly less than $1.04 a square foot.

(Def.Ex.B–58).

However Neckers never determined what area was leased by the Schmitts, and no accurate survey was ever performed. Neck-

ers concluded that the Schmitts "encroached on City-owned property" based on what he was told by staff and other members of the Department of Real Property. (Tr. at 3027).

Ultimately, Neckers determined not to sell the marina property to the Schmitts. This determination was based on the Schmitt Marina's DEC violations, the inaccurate survey, the inability to define the actual boundary of the Schmitt Marina, and the resulting inability to agree on price. Another important paper in this documentary case is a memorandum from Neckers to Lori Fierstein, Assistant Commissioner, dated October 20, 1989, entitled "Broad Channel Lease Termination," recommending that the Schmitt Marina tenancy be terminated:

Please note that the tenant for this parcel has been cited for numerous DFC violations as evidenced in the attached Notice of Hearing and Complaint. An administrative hearing was held July 6, 1989 but as of this date, no decision has been rendered.

*In addition, the tenant has expanded his marina operation, significantly exceeding the 40,000 square feet indicated in the 1962 lease. He currently occupies over 100,000 square feet which includes the use of land within the Gateway National Recreation area which is under the jurisdiction of the United States Department of the Interior.* The Department of Interior has commenced an action in Federal District Court to remove the marina from Gateway. The case is being handled by Kevin (sic) Cleary, Assistant United State (sic) Attorney Eastern District. In the even you want to contact Mr. Cleary, he is located at 225 Cadman Plaza East Brooklyn, New York 11201 and can be reached at (718) 330–7100.

In light of the tenants apparent DEC violations, unauthorized expansion and trespass into Gateway, it seems necessary to terminate this lease.

(Def.Ex.B–474).

Neckers' reasons for terminating the Schmitt Marina tenancy were "A combination of violations that—also that tenant had expanded his marine operations beyond the

40,000 square feet, and that there was an issue of whether he was in the Gateway National Recreation Area. And at this point, you know, they can't settle the DEC violations, they couldn't settle the issue with the government." (Tr. at 3419).

Despite the problems with the Schmitt Marina, the City conveyed the residential property to Adam. The Court commends the action of the City by Commissioner Neckers when he stated that "it seemed unfair to treat the house as part of a commercial business. And I instructed staff to see that it was surveyed and conveyed as part of the residential conveyance project." (Tr. at 3048).

Stuart Lowenthal is a licensed professional engineer and the Acting Director of the New York City Department of Business Services. His division examines applications for waterfront construction, inspects sites and issues certificates of completion, which are similar to certificates of occupancy. His division received an application from John and Adam in February 1994. He processed the file and a work permit card was issued on June 7, 1994 for "rearrangement of existing floats as per Plan # 7374 at the foot of 19th Road, Broad Channel." (Def.Ex.B–507). This permit apparently was based on an application dated March 11, 1994 which stated, "In an existing marina, installation of a floating dock assembly for approximately 120 small water crafts." (Def.Ex.B–525). This application was for the foot of 19th Road, which apparently is not in the area of the Cove, at the foot of 20th Road. The application stated that Adam was the tenant and that the City Department of General Services was the owner of the property. Based on the applicant's statements, the property at issue was zoned residential and a marina was not a permitted use.

The Schmitt permit was revoked by Lowenthal's department on July 18, 1994 (Def.Ex.B–508). The reasons for the revocation were, first, the property described on the permit is in fact owned by Adam as residential property, and use of the property as a marina would constitute a non-conforming use in violation of the zoning. Second, "The work notice inadvertently authorizes the installation of *additional* dockage for 120 watercraft, when it was intended to authorize only the *replacement* of dockage legally existing in the marina." (Tr. at 3147) (emphasis in original).

In 1990, Lowenthal's department issued a permit to one Ronald Finke for 18 slips in Broad Channel. Finke operated a restaurant and he applied to maintain slips "which were to be used exclusively for his restaurant customers to come and tie up and ... eat at the restaurant, and therefore it is not categorized as a marina." (Tr. at 3180). A permit was issued to install piles and floats for 18 slips. The Finke restaurant and boat slips were on the east side of Broad Channel, on the opposite side from the Schmitt Marina. Lowenthal conceded that he made an error regarding the grandfathering of the Finke boat slips. He should have raised certain issues as to the Finke application, but the Finke permit was never revoked.

In analyzing both the Finke and Schmitt applications, Lowenthal assumed both facilities were grandfathered in full. However, he learned that the grandfathering rights of the Schmitt house on West 19th Road were not applicable to the marina on West 20th Road. In addition, the Schmitts applied to *add* 120 more slips instead of *reconfiguring* the original 120 slips. Upon hearing this additional information, he revoked the permit.

On March 6, 1992, Lowenthal's department received an application by Marilyn Martin for the Sunset Marina located at 64 West 10th Road in Broad Channel. The Sunset Marina is located on the west side of Cross Bay Boulevard, the same side as the Schmitt Marina. The application was "to reconstruct 203 feet of existing timber bulkhead and to install docks and floats." Although there was a dispute as to the correct zoning of this marina, the Martin application was approved. The City sold the Martin–Sunset Marina property to Mrs. Martin under the non-residential phase of the Broad Channel conveyance project. Lowenthal testified that although the marina was probably zoned in R3–2, which ordinarily would not include a marina, it was "probably" grandfathered in. (Tr. at 3292). He explained the "grandfather" procedure as follows:

A The determining factor would be how many slips were there when the zoning resolution was adopted. So, theoretically if somebody had, let's say 100 slips in 1961, and had 50 slips last year, and asked to add 50 more to come up to the amount they had in 1961, it should be permissible. (Tr. at 3295).

Lowenthal also testified that grandfathering rights cease if the use is discontinued for a period of two years or more. (Tr. at 3328). Also, the grandfather rights are related to the specific structure in use in 1961. For example, if in 1961, a marina had 100 mooring buoys in use, they could not be converted into 100 docks. As to the replacement sought by the Schmitts for their docks, the new docks would have to be the same number, type and size as those grandfathered in and placed in the same location. For example, grandfathering rights applicable to the marina on 20th Road could not be applied to Adam's house on 19th Road because they were separate sites.

However, the Court finds that another element must be considered with regard to the Cove. Namely, the contention by the United States that the land and water constituting the Cove was transferred by the City to the Federal Government for Gateway in 1974 and became federal land at that time. As such, it was no longer City land and was not subject to City zoning regulations, including the City grandfathering rules. In this regard, Lowenthal testified as follows:

THE COURT: I will ask it.

If the government receives this property as part of the Gateway National Park, any such property, assuming it received such property, Mr. Lowenthal, would your authority to permit the zoning or terminate the zoning in that Gateway Nation Park area terminate?

THE WITNESS: Yes.

THE COURT: You wouldn't have authority to do it?

THE WITNESS: Yes.

(Tr. at 3326–3327).

Robert Gleusner is the Supervising Permit Inspector of the New York City Department of Business Services. His duties include supervising field inspectors and issuing summonses for violations. Gleusner formerly was a field inspector and visited Broad Channel once very two or three weeks. He inspected the six or seven marinas and boat clubs on Broad Channel. He issued a violation to the Finke Sandbar Marina for renting some of the slips instead of using them for restaurant patrons only. On September 16, 1987 Gleusner issued a notice of violation to John Schmitt for "No float plans for marina and no permits for new piles and floats installed." He issued the notice of violation after a personal inspection of the Schmitt Marina; based upon a complaint by a man located on the north side of the marina. As a result of this violation notice, Gleusner issued two summonses, although he could find no record of the disposition of the summonses. John Schmitt told him that they had been dismissed. In November 1994, several weeks prior to the day he testified in this case, Gleusner served a revocation order on the Schmitt Marina. This was the only marina revocation order he served.

John M. Schmitt is the son of Adam and Ernestine and the grandson of Adele. John was born in 1951 and was 43 years of age when he testified at the trial. The Court notes that John Schmitt is a poised articulate witness. He is also obviously comfortable in a courtroom setting having testified hundreds of times as a police officer in Colorado. (Tr. at 5767). John lived in Colorado between 1976 and 1981, and visited the marina only periodically during that time. He obtained numerous documents from the Parks Department of the City of New York which were received in evidence.

According to John, the Broad Channel community includes the toe of the boot, now referred to in some maps and documents as "Big Egg Marsh" (see for example the red outline made by John on Def.Exs. B–59, B–138 and B–152). John testified that the area east of the Cove was land and not marsh, while west of the Cove there is marshland. John explained that the marshland is subject to the tide and is covered by water two times a day. In 1963 his family operated the marina and he was present on a regular basis. In an aerial photograph taken on May 3, 1969,

**344**

the area east of the Cove appears to be marshland with no riprap wall in the area of the Hook partially encircling the cove. (See Def.Ex. B–78). Notably, in an aerial photograph dated August 8, 1984, there is definite evidence of land in the Hook (see Plf.Ex. 3).

John testified at length regarding the location and size of the Schmitt Marina. As shown on an aerial photograph dated April 19, 1954 (Def.Ex.B–2) John estimated the size of Adam's Fishing Station, including the Cove and the land at 300,000 square feet. In the June 11, 1959 rental memorandum (Def. Ex.B–398), it was noted that "a new agreement being drawn for additional space at increased rental, to start, as of 6/1/59." On July 2, 1959, a new lease was issued (Def. Ex.B–400), again describing the property as "Foot of West 20th Road." On August 12, 1959 another lease was executed (Def.Ex. B–402). While the lease stated "Additional space. Old agreements cancelled," it nevertheless described the lease premises as "Foot of West 20th Road" and the space as "200′ × 200′." However, viewing a June 24, 1959 aerial photograph, John estimated the size of the area occupied by the marina as 350,000 square feet. The Court is unable to ascertain how he arrived at this figure.

John described the area of John's Fishing Station acquired by his family from Pasienza in 1968. After the purchase, John's Fishing Station, and its customers, became part of the Schmitt Marina.

There are additional leases in evidence. The July 1, 1959 lease locates the premises as Block 210 "Foot of West 20th Road" for a "boat storage and fishing station." (Def.Ex.B–400). The August 12, 1959 lease describes the premises as "Foot of West 20th Road" in block 310. The space is listed as "200′ × 200′" (Def.Ex.B–402). Also in a letter from the City to Adele dated January 18, 1962 the lease property vas described as "Block 210—Foot of West 20th Road—Area 200 × 200 sq. ft." (Def.Ex.B–404). In addition, an application dated March 25, 1962 or March 28, 1962 also describes the area as "sq. ft. 40,000." (Def.Ex.B–149).

Reviewing the aerial photograph taken on June 24, 1959, when he was eight years old, (Def.Ex.B–169), John stated that Adam's Fishing Station used the water in the Cove and north of the Cove, while John's Fishing Station used the water in the West 19th Road canal. He described one long dock that went north to south (Dock A) and boats in the Cove on moorings. Also there were poles in the water in the Cove. He would row customers out to their boats moored in the Cove. According to John, the Cove belonged to the Schmitts. Notwithstanding the dimensions and locations set forth in all the marina leases, John "estimated" the square footage of both Adam's Fishing Station and John's Fishing Station in 1959, when he was very young, as a total of 400,000 square feet, including 300,000 square feet of land. (Tr. at 3645–3646).

John testified that the first photograph in which the Cove is shown was an aerial photograph taken some time between 1938 and 1940 (Def.Ex.B–155E). Prior to that time the photographs showed no Cove was in existence. According to John, the Cove "has been dug out" between 1924 and 1938. To demonstrate this point, John points to a 1924 aerial photograph which shows the toe of the boot without a Cove (Def.Ex.B–155C). John describes Broad Channel and its canals and streets as the teeth of a comb. He stated that the Cove and the canals in the teeth of the comb were man made and dug out after 1924.

John testified that block 210 "stands from Cross Bay Boulevard west all the way to the Raunt Channel." (Tr. at 3920). Therefore, the westerly boundary of the Schmitt Marina would be the Raunt Channel. The Court finds that the location of the "Raunt Channel" is somewhat confusing because various maps, drawn in different years and times in the development of Broad Channel, show the name "Raunt Channel" in various and imprecise locations. John says that this name was first used "in 1900 or even earlier," with regard to the "Raunt Channel." In this regard, the Court agrees with the Assistant United States Attorney, when he stated:

Secondly, there is a thing called the Raunt Channel. There is also a thing called the Raunt.

The problem is Mr. Citak's argument proves too much because the Raunt is everywhere. If you go through the map, the Raunt is around the island, the Raunt is an island. The Raunt is a term that is used very generally out there and it is not something of absolute precision.

Okay. So that's what the Raunt is. Nobody knows what the Raunt is.

(Tr. at 3922).

Although John asserted that there was a "definite understanding" of the location of the Raunt, when asked to describe this location he stated that there were "only three locations known as the Raunt." The Court finds that the parties failed to prove any determinative relationship between the so-called "Raunt Channel" and the issues in this case. This is so, despite a City document describing the western boundary of the Schmitt property as the "Raunt Channel" (Def.Ex.MM). The problem is that other documents place the Raunt in different locations (see for example, Def.Exs. C, B–140 and B–147).

Another confusing and unclear area in this case is the different block and lot numbers in the many documents in evidence. The geographic maps, developer maps and tax maps over many years and a rapidly evolving area, apparently have different block and lot numbers. For example, on a tax map the block numbers show as 15350 (Def.Ex.B–147). How this tax map number relates to "block 210" as set forth in the lease documents, is unclear.

John testified that he took over the ownership and operation of the marina in 1981. The first notice he received of a claim by the Federal Government was in 1989. The Federal Government claimed that "the Schmitt Marina was trespassing and they wanted me to move my docks, my walks and my house." (Tr. at 4100). In 1990 or 1991 he received notice from the City that he was encroaching on City-owned land. A significant letter dated September 30, 1983, warned the Schmitts about John's "unauthorized grading and filling of unleased City-owned land, that adjoins property that you lease from the City of New York" (Def.Ex.B–417). The letter ordered John to "cease and desist from doing this again." He was further warned that "any repetition of this type activity in the future by you or any of your agents will cause the City to take appropriate action in the Courts." John stated that he was not filling in the area but "was just digging." (Tr. at 4132).

As stated above, Ronald Trenchetto, the Broad Channel Director, wrote to the Schmitts and to the commanding officer of the 100th Precinct on January 10, 1984 to follow up on the prior notification, (Def.Exhs. MM and B–421). Once again, the Schmitts were notified not to grade or fill on unleased City-owned property. Trenchetto wrote to the Schmitts again on February 29, 1984 and reiterated the City's warning that "any further repetition of this activity will result in the initiation of eviction proceedings and an immediate termination of your lease." (Def.Ex.B–424). This letter also refers to Carl Mednica and "the property he leases located next to your leased site." There is no documentary evidence to support the assertion that Mednica leased the area of the Hook.

Another document adding to the confusion about the exact boundaries of the Schmitt Marina is a letter from DEC to Neckers, Assistant Commissioner of City Division of Real Property dated April 29, 1986 (Def.Ex.B–111). In this letter, DEC recites certain violations with regard to "placement of fill and erection of a retaining seawall in navigable waters, tidal wetlands and adjacent areas" at a site leased to Schmitt's Marina. In this letter it is stated that after discussions by the City and DEC "it is clear that no specific boundaries exist under Schmitt's lease." The Court finds that the only clear delineation of the boundaries of the Schmitt Marina are in the original City leases which describe the property as at the foot of West 20th Road and 200′ × 200′ in area.

There is in evidence a handwritten appraisal by Franklin M. Glaspie, Jr., a City employee after an inspection on April 16, 1992 (Def.Ex.B–439). John was present at the time of this inspection and appraisal. This document relates the history of the Schmitt Marina, as follows:

## History of Subject Property

The subject property was first leased to Adele Schmitt on July 1, 1959 from the City of New York for $124.00 a month. There was a second lease in 1962 that set forth an area of 40,000 square feet to be leased for $150.00 a month. Currently the subject property, which comprises 506,089 square feet, is being leased for $229.00 a month. It is operated and occupied by John and Adam Schmitt and is known as Schmitts Marina.

John was questioned about the 1992 appraisal and the increase in the boundaries of the Schmitt Marina, which apparently took place over the passage of years and is of the view that the Schmitt Marina occupies more than 506,089 square feet:

Mr. Schmitt, is it your testimony that you leased that entire area?

A No, it is not.

Q Is it your testimony that the area you lease includes that entire area?

A Some of it.

Q Some of what?

A Some of that area includes, and some does not include.

Q So, in your view it is not an accurate depiction of your leasehold?

A That's correct.

. . . . .

Q Isn't it also true that this memorandum states that the tenant, that is to say, Schmitt's Marina, is occupying about 506,-000 square feet of land?.

A Yes.

. . . . .

Q Looking again to your notes to this appraisal, it says here the subject property was first leased to Adele Schmitt on July 1st, 1959 from the City of New York for 134 dollars a month.

Do you see where it says that?

A That's correct.

Q There was a second lease in 1962 that set forth an area of 40,000 square feet to be leased for $150 a month.

Do you see that?

A Yes, I do.

Q Currently the subject property which comprises 506,089 square feet is being leased for 229 dollars a month.

Do you agree with those statements? Do you think they are accurate?

In particular let me ask you—let me withdraw that.

Is it true that you present lease approximately 500,000 square feet; is that true?

A I believe it is closer to 600,000.

Q I want to hear what you have to say on this and why you think this is ·wrong.

So, your view is that—how large is the size of the July 1, 1959 lease mentioned in the first sentence for $134 a month? How large was that?

A 40,000 square feet short of 600,000.

(Tr. at 4487–4493).

John testified that the water in the Cove is included in the lease to his family, but was not included in the 1992 appraisal. If so, the claimed area of the Schmitt Marina is greatly in excess of 506,000 square feet, an unlikely circumstance.

As to the filling and dumping, John testified that the Schmitts did "legal filling" in the wetlands in and prior to 1968. For example, he acknowledged replacing a bulkhead at the shoreline where the land and the water meet and doing filling "behind the bulkhead" in 1984 and 1988. (Tr. at 5091–5092). Nevertheless, John denied that the Schmitts did any filling in the wetlands after 1968. (Tr. at 5038–5039). John consistently denied that the Hook was part of his leasehold, and he emphatically stated that the Schmitts never exercised any dominion and control over the area of the Hook. This was the area that DEC wanted the Schmitts to "clean up." The Court finds that it was convenient for the Schmitts to disclaim control over the Hook for two reasons. First, someone filled in the Hook and destroyed the natural habitat, with the ensuing potential liability to such a wrongdoer. Second, the Schmitts did not need to claim that their leasehold included the Hook. It was built to shelter their boats in the Cove and thus was beneficial to the operation of their marina, without the accompanying remediation prob-

lems. Stated simply, the Schmitts wanted and obtained the benefit of the shelter of the Hook, without any of the liabilities.

All during this time, the City and the DEC attempted to obtain an accurate survey of the Schmitt Marina, without success John testified that he never authorized a survey and never saw a final survey of the marina property, although he asked the City for such a survey for years. (Tr. at 5098–5099). John adhered to his view that the Gateway map did not accurately describe the boundaries of Gateway, despite the fact that the metes and bounds in the Gateway map "precisely tracks the March 1, 1974 conveyance, which is Exhibit 5 in evidence." (Tr. at 5527). In fact, John stated a number of times during his testimony that the National Park Service did not know the boundaries of its own parks in the area of the Schmitt Marina. The Court disagrees and finds that the metes and bounds on the Gateway Conveyance Deed and Map accurately describe and show the Gateway boundary near the Schmitt Marina leasehold.

Another summons against John Schmitt was issued by the City on January 19, 1989 for placement of fill in regulated tidal wetlands without required permits. (Def.Ex. B–463). This case was dismissed after trial in the Criminal Court. After this dismissal, the DEC served a notice of violation against the marina. There was a hearing on this violation on July 6, 1989. John did not attend this hearing because he was sick. Following the placing of this DEC violation, John was contacted by the United States by letter dated January 4, 1989 (Def.Ex. N–1). John stated that this was the first notice to the Schmitt family from the Federal Government. This letter stated, in part:

Dear Mr. Schmitt,

[P]ortions of a marina facility owned and operated by you are trespassing onto United States Government Property. As Shown in the enclosed aerial photo, boundary map, and survey (Figures 1 – 3) all of the floating docks and mooring slips, and portions of structures and outbuildings are on property administered by the National Park Service. The exact location of the boundary will be surveyed in the near future.

In addition to the trespass problem, there has been extensive unauthorized filling of tidal wetlands. Information provided us by the New York State Department of Environmental Conservation indicates that this fill has been placed in conjunction with the operation of your marina, and that you have been issued cease and desist orders to halt.

By this letter, I am hereby notifying you that you are in trespass on property belonging to the United States, and that all structures, improvements, and associated materials and goods must be removed. Fill placed into tidal wetlands must be removed and the site restored to its original condition. In addition, this matter will be referred to the United States Environmental Protection Agency and United States Army Corps of Engineers.

. . . . .

If we have not heard from you within ten days of your receipt of this letter, this matter will be referred to the United States Attorney for prosecution.

John replied to this letter and in response Gateway wrote to John on February 3, 1989, enclosing a copy of the laws and deed transferring the City lands to the United States, together with 1984 aerial photographs. (Def.Ex. N–2). Thereafter a "public notice" was placed in the local newspaper, The Rockaway Wave, by the Assistant United States Attorney in charge of this case. (Def.B–476). According to John, as a result of this published advertisement about 200 of his 250 customers requested return of their deposits and departed the marina. Also, John stated that this notice had a "detrimental effect on the name of the family."

On May 10, 1990 the City served a "thirty day notice to vacate premises." (Def.Ex. B–479). One of the notices was for a 40,000 square foot expired lease and the other was for unleased property occupied by the Schmitts. Remarkably, John testified that he received about seventy thirty-day notices. The alleged violations of the lease include: (1) expanding beyond the boundaries of the

leasehold; (2) DEC violations; and (3) trespass into Gateway. After receiving the May 10, 1990 thirty-day notice, the Schmitts commenced a legal action in the Supreme Court, Queens County, to prevent the City from terminating the lease. ("The State Action"). In response to these charges, John testified that there was no change in the area used by the marina between 1970 and 1990. The Court disagrees and rejects this contention.

Presently, John is paying rent for the Schmitt Marina in the sum of $229.00 per month. He has continued to pay this rent to the City and, as of June 16, 1995, the date he testified on this subject, the City has continued to accept the rent.

### B. *The Alleged Conspiracy*

The Schmitts claim that they are the victims of a conspiracy between the Federal Government, the State of New York and the City of New York. As John put it:

I believe that the City, the state and the federal government realized that there was a mistake made, and that it went on for so long they didn't know what to do. So they had a meeting and decided to try to put pressure on to me to go ahead and put me out of business; that the federal government requested that the docks could stay in place, but I was not allowed to have customers at my marina ... And not only that I loss income from my customers.

I believe that the City of New York has systematically reduced the size of what they believe to be my marina ... Systematically it kept decreasing where they took the one lease for 40,000 square feet, and went ahead and tried to relate that it's the whole that it is the whole leasehold interest, that it was only 40,000 square feet. They indicated that the 40,000 square feet is completely within the—away from the water; that not one inch of the marina water is available, even though the documents state that portions of the marina were constantly under water.

. . . . .

... And as soon as they talk about lease there is this 40,000 square feet of area that is up on land that is not anywhere near the water.

They systematically tried to say that block 210 is an exact location, that it is from a developer's map, although the documents show that block 210 whole area is the marina, that the whole area was called block 210 . . .

. . . . .

I think there is ample evidence to show that we did have permits.

The Court was led to believe that Nationwide Permit was piece of paper, to the point where quite a few times I constantly said I had a Nationwide Permit.

I was told by the Army Corps of Engineers I had a Nationwide Permit.

. . . . .

I believe that all the little untruths or inaccurate statements add up to show that there was combined effort to go ahead and try to get me off the land. One may have wanted it for purposes of mitigation. Another one may have wanted it for purposes to clear out the problem, and some of them I believe was for personal gain. I believe that the concessionaire of Barren Island Marina pled guilty to bribery. He had to bribe somebody.

(Tr. 5257–5272).

In support of his "conspiracy" and "vindictiveness" theory, John points to the handwritten notes of Shelly Goldman, the City Director of Lease Enforcement, made in 1992, that our "Plan now—is to put Schmidt's (sic) against the wall so we can dictate the terms of a lease to him." (Def.Ex. B–495). As will be set forth later in this opinion, the Court finds that the Schmitts failed to prove any unlawful conspiracy or vindictiveness on the part of the United States, the City or the State of New York.

The Schmitts also allege an apparent equal protection or selective enforcement claim. John testified that there are 24 clubs and marinas on Broad Channel, some of which encroach on Gateway property. He points to the Sandbar Marina, located approximately 450 feet from the Schmitt Marina, as encroaching over the pier and dock lines. Also, the Sunset Marina on 10th Road, which is eight blocks away from the Schmitt Marina,

was permitted to use its docks. In addition, John contends that the Sandbar, JB and Sunset Marinas all received City permits, which was denied to the Schmitt Marina. After reviewing the aerial photographs and the relevant documents, the Court sees no massive encroachment similar to the Schmitt Marina Cove and Hook situation and the substantial self-enlargement of the Schmitt Marina property.

In this regard, John testified that he is the only resident of Broad Channel who was denied the right to purchase his leasehold. Also, he purportedly was discriminated against in connection with the installation of sewers in Broad Channel in 1991. Further, the Army Corps of Engineers gave a permit to the Barren Island Marina, but his application was never acted upon. The Court notes, however, that the Barren Island Marina is not on Broad Channel and its status is irrelevant to the factual situations involved in this case.

In his preliminary injunction hearing, and at this trial, John admitted that the boundaries of his lease were indefinite, without exact metes and bounds. He was questioned about this testimony at the preliminary injunction hearing:

Question: Perhaps, can you explain?

Answer: They rented the property down there, they had no markings or boundaries. Nobody ever knew where it was. When records changed, when people in the office, that is what I believe, started giving exact figures, someone put block 210, lot 99, they said put it down, 40,000 square feet, that's 4 0 0 0 0, 40,000 square feet. And the guy would come down every month from the Department of Real Estate collecting his rent. And that is going on for years.

Question by the Court: It is a very indefinite boundary?

The Witness: Yes.

(PI Tr. at 1362); (Tr. at 5583).

Edward Smith was the City Real Estate Manager for Broad Channel during the period of the 1960s and 1970s. John admits that Smith used to "hang out at the marina." On August 28, 1978, in a City disciplinary proceeding, Smith pled guilty to charges involving corruption. Having read the file involving the disciplinary proceeding, John testified that Smith was not an "honest civil servant" and "was a crook." (Tr. at 5606). The United States attempted to show that this corrupt City manager permitted the Schmitts to expand their 40,000 square foot lease to what they claim to be approximately 600,000 square feet for a rental of $150 to $229 per month. The Court agrees and finds that Smith permitted the Schmitts to expand their lease without valid authority by the City:

Q How many square feet including—let's call it bottom lands, land under water. How many square feet of you claim you were leasing from the City of New York in the early 70's?

A I believe it to be around 600,000 square feet.

Q So you think $150 a month in the early 70's was a fair rent for 600,000 square feet of land, of city land?

A I can't answer that—do I think $150?

Q Yes.

A No.

(Tr. at 5616).

Actually, the Schmitts paid more rent in 1962, namely $250 per month, than the $229 per month they now pay. Indeed, they have not paid any rent on the Orean–Pasienza leasehold since 1989, because of the eviction proceeding by the City.

John met with Gateway officials prior to the 1974 conveyance deed and knew that "The National Park was being set up on (his) doorstep." (Tr. at 5659). However, he did nothing to ascertain the exact boundaries of his lease, knowing that Gateway was at his doorstep and may very well have included a portion of the land and water which he claimed to be part of the Schmitt Marina. John apparently took his chances.

John testified that he knows Mednica as a contractor who stored equipment at the Schmitt's boatyard. John corroborated Mednica's testimony that the Schmitts permitted Mednica to store his equipment without charge, in return for allowing them to use his equipment. John was questioned about

Mednica's deposition testimony linking the Schmitts to filling the Hook. He stated that Mednica stored two boats on Schmitt Marina land and no fee was charged, even though their normal fee was $1200 per season, because they used Mednica's backhoe, which was stored at the boatyard. John denied that his family was involved in the filling of the Hook in 1975 and 1976. However, the Court notes that he was in Colorado on a local police force during that period and only returned periodically to Broad Channel. John admitted that his family strung rope and tires on the edge of the Hook, "to act as a breakwater." He also conceded that a riprap wall of broken concrete "would have done a better job than these tires on a rope."

Despite the number of City leases with the Schmitt family which state that the leased property is 200′ × 200′ or 40,000 square feet, John continued to deny this documentary fact. (Tr. at 5804, 5820–5823). The Court finds that John Schmitt was an evasive witness who repeatedly refused to admit facts clearly set forth in the documentary evidence. The Court further finds that all of the Schmitt leases set forth a leasehold consisting of 200′ × 200′ or 40,000 square feet, even though John now claims that the Schmitt Marina leasehold is in excess of 600,-000 square feet. The Court finds no such support for the Schmitts claim of a 600,000 plus square foot marina. The Court finds that John Schmitt attempted to avoid the contrary clear documentary evidence merely by saying that "he doesn't agree" with this evidence.

As to the fraud cause of action by the Schmitts against the City, the complaint alleges that the Schmitt family was fraudulently induced to enter into leases that they would not otherwise have entered into, but for misrepresentations by various city officials at various dates from the 1960s through the 1980s. John contends that the misrepresentations were by City officials in that they underestimated the size of the Schmitt leasehold. However, John expressly denied that the Schmitts were fraudulently induced to enter any lease:

Q Mr. Schmitt, what lease did you enter into that you were fraudulently induced to enter into?

A I don't believe we were fraudulently induced to enter any lease, if that is what you are asking me?

(Tr. at 6217).

Other claims of fraud by the Schmitts include: (1) that the property they are leasing has been illegally taken away from them; (2) that the City is now stating that the leased premises is smaller than actually leased; (3) that the City gave testimony in the DEC trial that we leased certain property and then, later on, stated that we didn't lease that area; (4) that although the City represented that the Schmitts were treated fairly, they were the only tenant who was denied the right to purchase the land; (5) that the City alleged that the Schmitts "were scofflaws and committed DEC violations", while 50 percent of the people in Broad Channel also had violations; (6) the City refused to allow the Schmitts to use their water rights; (7) the City granted other marinas in Broad Channel the right to use water and docks outside of their lease boundaries; (8) in shutting off the water to the Schmitt's home; (9) in not stopping Mednica in filling the area around the Hook; and (9) in denying the Schmitts the right to hook up to the sewer system. The Court finds that none of these allegations, even if proved, would establish a viable tort action in fraud.

John also testified about the Schmitts' claim of breach of the implied covenant of quiet enjoyment. However, he conceded that there has never been an actual eviction or a constructive eviction, in that the Schmitts have never been physically removed from the property nor have they abandoned any part of the leasehold. John contends the eviction is evidenced by (1) shutting off their water; (2) refusing to let them put boats in a certain area of the marina. Insofar as the shutting off water contention, the initial problem occurred in the midst of the litigation, concerning the lease boundaries. Ultimately, the City offered John a standard license agreement to permit him to repair the water line (Def.Ex. B–489) and he declined to sign it. (Tr. at 6244–6245). Fur-

ther, in the 1959 lease (Def.Ex. B–400), and the 1962 lease (Pl.Ex. 27), the Schmitts agreed not to make any improvements without the written consent of the City, and they never obtained any such written consent.

At the time he testified in 1996, Edward Smith was 89 years of age and decidedly feeble appearing and sounding. As stated above, he was a real estate manager for the City Department of Real Estate, was in charge of the Department of Real Estate in Broad Channel, and, in that capacity he drew up leases. Smith vas familiar with that area and its boot shape and was also familiar with the Schmitt Marina, located "in the area of West 20th Road," which was one of the larger pieces of real property in Broad Channel, a portion of which was water. There were no markings in metes and bounds on Broad Channel.

Smith remembers the Schmitt family, "a very fine family." During his time at Broad Channel he became friends with Adam and "would like to help them." (Tr. at 6424). His signature appears on an application for permit dated March 25, 1962 (Def.Ex. B–149). He drew the diagram on the document which was for "additional portion which we charged X-amount of dollars more on the leasehold." (Tr. at 6382). However, when he was asked to explain what he meant by "additional land," Smith responded "I'm sorry. I just can't think straight." He wrote the space figure as "200 by 200" and "40,000 sq. ft." and that "portions of the area are constantly underwater." (Tr. at 6385–6386). Although this lease calls for an increase in rent, it does not say that the amount of land is being increased. Smith also signed the lease dated April 16, 1962, which refers to block 210, foot of West 20th Road, area of 40,000 square feet. (Pl.Ex. 27). However, Smith testified that even though the lease said 200' × 200' and 40,000 square feet, Adam's Fishing Station occupied a lot more land.

Smith recalls that the John Orean lease, which was purchased by Adam Schmitt was "about 20 by 20" in size. Orean stored boats at his marina along the 19th Road canal. Asked to describe the boundaries of Adam's Fishing Station (the Schmitt Marina), Smith

stated "I couldn't tell you that." (Tr. at 6398). Of importance, Smith testified that he did not think the Cove was part of the leased property:

Q Do you recall, Mr. Smith, whether there was a cove in that area?

A There was a cove, yes.

Q And was the fishing station—was the cove part of the fishing station?

MR. SHAW: Objection.

THE COURT: Overruled.

A I imagine Mr. Schmitt used to store boats there.

THE COURT: I'm sorry. Read it back.

(Record read.)

Do you remember the cove?

THE WITNESS: I remember the cove, yeah.

THE COURT: *Was the cove part of the property that was involved in that document you just saw?*

THE WITNESS: *I don't think so.*

(Tr. at 6401) (emphasis supplied).

Smith does not recall "any incident of Adam, Schmitt being involved with any fill." However, on cross-examination he conceded that he may have been aware of hundreds of dump trucks depositing concrete at the foot of 191 Road.

By deposition, Shelley Goldman, Director of Lease Enforcement for the City Division of Real Property, testified that legal action was initiated on only one situation on Broad Channel, namely, the Schmitt family and Marina.

Glen Chernick also testified by deposition. He was Assistant General Counsel in the City Division of Real Property and also was Project Manager in Broad Channel. He visited the Schmitt Marina one time in 1989, 1990 or 1991. Two thirty-day notices were served on the Schmitts in 1990. Questioned about the location of the Schmitt Marina, Chernick testified that the location is based on the lease description, namely, "Foot of 20th Road" and "40,000 square feet." He stated that he did not know where the 40,000 square foot area was located and he could never locate the boundaries of the Schmitt property or of the Raunt Channel.

## C. *The Schmitt Damages*

John testified as to the damages allegedly caused by the actions of the City, State and Federal Government in the so-called conspiracy against the Schmitt Marina. John testified that prior to May 1990 the marina rented 250 slips or spots in the water. He stated that when the preliminary injunction was issued in May 1990, the marina lost all its customers and could not rent any spots in or out of the cove. The marina lost both summer and winter storage customers. The summer customers rented from April 10th to October 10th. The winter customers rented from October 10th to April 10th. In May 1990, the fee charged was $1200 per year per boat, for both summer and winter. Because they only had one dock from 1990, they suffered a substantial loss of docking fees. Their boats had to be stored on land and they were compelled to purchase a forklift for the sum of $150,000.

In addition, the marina sold Monarch boats and had two other boat dealerships. The marina lost these dealerships when the water portion of the marina was shut down. The marina presently has one engine and one cruiser dealership. John testified that he could not put a value on these lost dealerships. The Schmitts also incurred legal expenses, court costs and the expenses for expert witnesses. In addition, the engineering work to obtain permits cost between $30,000 to $40,000. The Schmitts introduced a handwritten chart setting forth their alleged damages as of August 1995, as follows:

### DAMAGES

| | |
|---|---:|
| Attorneys fees incurred (app) | $400,000 |
| Court Reporter | 11,000 |
| Engineering Expenses | 64,000 |
| Loss of Dockage | |
| 1200 per slips X 250 | 300,000 |
| # of years | 4 |
| Total Loss | $1,200,000 |
| 1200 per slips X 210 | 252,000 |
| Total | $1,927,000 |

However, as to damages, John testified in his deposition that he still had 75 "high and dry" customers at $1200 per year. At the trial, John changed his mind and testified that, he "counted them" and only had 40 such customers. The Court notes that the Schmitts did not have any "high and dry" customers prior to the issuance of the preliminary injunction, so these any "high and dry" customers would mitigate their damages.

In addition, John conceded that the year prior to the imposition of the injunction, namely 1989, was not a profitable year. In fact, John testified that he couldn't say whether there ever was a net profit from the operation of the marina since 1981, and that in 1986, he had less customers than in 1989. Also, John testified that the industry seems to be going to a high and dry rack storage business and the boats are stored on land rather than in the water.

## D. *The United States Rebuttal Case*

Andrew B. Karn, a licensed professional engineer, was formerly an Assistant Chief Engineer in the Department of City Planning, and is a licensed professional engineer. The Court finds Karn to be an articulate and credible witness. In 1974 he was involved in mapping the Gateway National Park Conveyance. The City never before faced such a massive conveyance of real property. Fruchtman, who testified on behalf of the Schmitts, was the Chief Engineer and Karn's immediate supervisor.

Karn reviewed the Gateway Conveyance Map (Pl.Ex. 38 B–1). The exclusions from Gateway include the shaded area of Broad Channel. He stated that the foot of the boot is called the "Big Egg Marsh," which is part of Gateway. In this regard he disagrees with Fruchtman. So does the Court. The Court finds that the toe of the boot, now referred to as the Big Egg Marsh and the Cove and Hook were included in the Gateway Conveyance and are part of the Gateway National Park. Karn also disagrees with Fruchtman's definition of "bounded by," in that it means not included within, or forming a boundary. (Tr. at 6673–6674). Again, the Court agrees.

Joseph J. Seebode is Chief of the Regulatory Branch of the New York District of the United States Army Engineers. He testified that a nationwide permit "is a type of general permit that authorizes work of a minimal character with little or no paperwork ... to allow decisions to be made very quickly on minor projects with minimal individual or

cumulative adverse impacts." There is a Nationwide Two Permit that allows the building of a dock in artificial canals in a primarily residential area. The canals described as the teeth of a comb on Broad Channel *are* such artificial canals in primarily residential areas. For such "mom and pop" docks in these artificial canals no individual permit is required.

On the other hand, Seebode testified that the Cove would not be characterized as a canal, and it is not in a primarily residential area. After reviewing the aerial photographs, Seebode agreed that the Cove was man made and was created some time between 1924 and 1938. He stated that the circular dredged Cove in the marshland was not a linear "canal" in a primarily residential area. In this regard Seebode disagrees with Mansky. Seebode testified that the Cove is a facility that had more than 200 boat slips; was obviously a revenue generating commercial operation; and could not be classified as a primarily residential area. The Court agrees and finds that the Cove is not an artificial canal and the docks in the Cove are not entitled to a Nationwide Two Permit.

Seebode conceded that if Dock A was in existence prior to December 1968, it would be permitted today under the grandfather clause previously referred to. The 19th Road canal would also be similarly permitted. He further testified that if any other dock, mooring, piling or buoy was in the water in the Cove prior to December 1968, they could be grandfathered as well. However, if such physical appurtenances cease to exist for two years, they would lose the grandfathering rights. Also, if the docks were substantially altered or expanded they would lose the grandfathering rights. In sum, such docks, moorings and pilings would have to continuously keep their form as they existed in December 1968.

The Court finds that the only structure in the Cove that continuously kept its form substantially in the same condition as it was in December 1968, was Dock A and its small appurtenance. It is the only Schmitt Marina structure that is entitled to remain in the Cove as part of the Schmitt Marina in its present condition.

## E. *The Case of Third Party Defendant the City of New York*

Margo Moehring has been Executive Director of Strategic Planning of the City Division of Real Estate Services since 1982. In that capacity, she is the Project Manager at the Broad Channel Conveyance Project. Moehring visited Broad Channel a number of times including one visit by police launch to see the Schmitt Marina from the water. Moehring was a key City witness, who is very credible. Using the developer's map (City Ex. DA) and a City map dated April 5, 1946 (City Ex. DE), Moehring identified the foot of West 20th Road and 96th Street. She testified that the western edge of 96th Street and West 20th Road is the border between City and federally owned land. The intersection of 96th Street and West 20th Road is where 20th Road ends and is the "Foot of West 20th Road." On Pl.Ex. 41, Moehring pointed out West 20th Road, 96th Street, and the "Foot of West 20th Road." The entire length of West 20th Road is not paved and the pavement stops short of the intersection with 96th Street. The Court agrees with the Moehring description of the Foot of West 20th Road and the line of demarcation between City and Federal property. The Court finds that the border of the Gateway National Park in that area are the lines formed by the intersection of 96th Street and West 20th Road.

The Conveyance Project was a plan to convey the Broad Channel property only to tenants of record and of good standing. Moehring explained that a tenant in good standing meant "that you haven't violated any of the provisions of your lease" and you "would have to not be in violation of any laws or regulations of other governmental bodies and not have any outstanding obligations." (Tr. at 6866–6867). Broad Channel tenants who were determined to be not of "good standing" included Corbo (using leased premises as a maritime junkyard); Rich (outstanding DEC violations and illegally occupying property); Monaghan (stopped payment on money orders) and Schmitt. Of these four tenants, only Monaghan was permitted to buy his property, after a lawsuit and a settlement. If tenants of record cannot be

found, occupants were permitted to purchase the land. Also, under certain circumstances, tenants can purchase adjacent, non-leased property.

The sale of the Broad Channel properties to the tenants commenced in 1982. At that time, there were approximately 900 residential tenants and 50 non-residential tenants on Broad Channel. As of the present date, about 900 sales have been consummated. Of course, the City could not and never did sell any Gateway property. Moehring acknowledged that the Schmitt Marina is a tenant in Broad Channel, and a potential purchaser of leased City property. However, no offer was made to the Schmitt Marina because "they were not a tenant in good standing with the City of New York." This determination was made by Charles Neckers after consultation with Lori Fierstein, an Assistant Commissioner of the Division of Real Property. At that time a memorandum was issued by Commissioner Neckers, summarizing the City's problems with the Schmitts, including DEC violations, unlawful expansion of the marina operations, and encroachment.

The Schmitts repeatedly were warned about these transgressions to no avail. For example, as far back as September 30, 1983 the Broad Channel Director wrote to Adam, Adele and Ernestine to "advise you that any repetition of this type of activity in the future by you or any of your agents will cause the City to take the appropriate action in the Courts." (Def.Ex. B–417) (emphasis supplied). In a letter dated June 4, 1985, Adele again was notified that the City would not sell the land to any tenant who was in violation of governmental regulations. (See Def. Ex. B–425).

Apparently, as a result of inefficiency, bureaucratic morass and/or corruption, the City officials in charge neglected to take any action until the Federal Government took the initiative by bringing this action. Not even the warnings by the State DEC stirred the City to action. On April 29, 1986, the DEC Regional Attorney wrote to Assistant Commissioner Neckers complaining of environmental violations by the Schmitt Marina, and requesting the City to determine the proper boundaries of the Schmitt Marina so that the environmental violations could be resolved. (see Def.Ex. B–111).

Moehring reviewed the history of the Schmitts at Broad Channel starting with the sale from Huntsinger & Meyer to Adele Schmitt in 1944, covering an area located at the foot of West 20th Road including "vacant tide and marsh land," meaning where the land and the water meet. The first City document involving the Schmitts is dated January 9, 1945 and refers to the "foot of West 20th Road." The subsequent leases refer to the "Foot of West 20th Road" in an area of "200′ × 200′" or "40,000 square feet," as has been previously noted in this opinion.

The last lease entered into with the Schmitt Marina was in 1962 (Def.Ex.DO). The lease recited the same 40,000 square feet at the foot of West 20th Road for use as a boat storage and fishing station. This area is to the north of 20th Road and does not extend west of 96th Street. Moehring stated that the Schmitt Marina lease does not extend west of 96th Street, which is land totally under water. Mednica was the tenant to the south of the Schmitt Marina. Moehring testified that neither she, Edward Smith, Nicholas Corrado, Ronald Trenchetto, Edward Sadowsky, Joseph Donahue or Charles Neckers have any authority to bind the City of New York to orally extend the area of a written lease.

Since 1962, the City entered into no additional leases with the Schmitts for the land at the foot of West 20th road. There were leases after 1962 for the 19th Road property. Rent for the Schmitt Marina increased to $229 per month in 1980. Since 1980 the Schmitts have been paying $229 per month in rent for the Schmitt Marina. Moehring testified that this is not fair rental value. The Court agrees.

As a basis for the City's counterclaim, Moehring referred to the terms of the 1962 lease (Def.Ex.DO) and the stated obligations of the Schmitts as tenants, as follows: (1) the tenant agrees to take care of the premises and be responsible for all acts of waste; (2) the tenant agrees to hold harmless landlords, representatives and employees from any claims for damages by reason of injury to

persons or property occurring on said property; (3) the tenant agrees to comply with all laws, rules, regulations and orders of federal, state and city authorities; (4) the tenant agrees to make all interior and exterior repairs at his own cost and expense, and keep the demised premises and the adjacent site in good repair and free from deposit of objectionable materials; and (5) the tenant agrees not to make any improvements or alterations without the prior written consent of landlord.

Moehring testified that the Schmitts violated all of these stated obligations under the lease, "by encroaching on federal property, by violating the Rivers and Harbors Act, by getting state DEC violations, and by squatting on city owned property," by filling and dumping on the site, and constructing "buildings and docks ... without the prior approval of the landlord." (Tr. at 6997–6998).

The City did sell Adam the 19th Road leasehold containing his residence. Although the original lease was for commercial purposes (John's Fishing Station), Adam advised the City that he no longer intended to use the property for commercial purposes and it was sold to Adam as residential property.

Moehring testified that the phrase "Broad Channel community" means the inhabited area of Broad Channel, while "Big Egg Marsh" is the uninhabited toe of the boot. Based on all the testimony and the documentary evidence in this case, the Court agrees and so finds.

Moehring made a valiant effort to verbally describe the area of the Schmitt Marina lease. In the Court's view, it was the clearest description of the Schmitt Marina adduced at this trial.

Q · Go ahead.

A Beginning at the foot of West 20th Road ... it includes West 20th Road, so that—one moment, and let me figure out my directions.

. . . . .

So the southern boundary would be 200 feet along the southern side of West 20th Road, and including it.

The western boundary would be 200 feet, extending from approximately the foot of West 20th road in a northern direction. Then there would be another 200 foot boundary going east, and connecting at a right angle to the southern boundary of West 20th Road, and including it, and it would be a square.

THE COURT: It is in the form of a square?

THE WITNESS: Yes.

THE COURT: Not bad, not bad. I don't know whether it is accurate or not, but it is not bad.

Q And clearly, Ms. Moehring, what you testified to is that the Schmitt leasehold interest as far as you know was a square piece of property?

A Yes.

Q 200 by 200 square?

A Yes.

(Tr. at 7513–7517).

Reviewing the various leases, Moehring stated that the 1959 lease consolidated the 1949 and 1952 leases, added a little land, and for the first time set forth the dimensions "200 × 200" or "40,000 square feet" with some of the property under water, also located "at the foot of West 20th Road."

Emanuel Bornstein, a professional engineer, formerly was employed as Director of Surveys and Asset Management of the City Division of Real Property. Bornstein was qualified as an expert in area measurements. He is familiar with the configuration of the Schmitt Marina and surveyed it in 1993 for Assistant Corporation Counsel Shaw. Bornstein concluded that the land occupied by the Schmitt Marina was "under 300,000 square feet" in the shape of an "irregular polygon." He made the survey with two other men, using a transit and other instruments.

In this regard, the Court notes that an April 16, 1992 report records that "currently the subject property ... comprises 506,089 square feet .. leased for 229.00 a month." (Def.Ex.B–439). There is much confusion in the City records with regard to the area actually *occupied* by the Schmitts as differentiated by the area actually *leased* to them. This additional area occupied by the Schmitts is the source of the problem. This additional space was never validly leased to the

Schmitts. The marina lease was for 40,000 square feet only. The Schmitts occupied the additional massive space without permission and they did so at their own peril.

Robert Gochfeld is the team leader for mapping in the Technical Service Unit of the New York City Department of City Planning. Gochfeld reviewed the Gateway Conveyance Maps (Pl.Ex. 38A–1 and 38B–1). He testified that the Broad Channel shaded area was *not* to be conveyed to the Federal Government for Gateway. This shaded area did not include the Big Egg Marsh the Cove and the Hook, which areas *were* conveyed to form part of Gateway. According to Gochfeld the toe of the boot—which includes the Big Egg Marsh, the Cove and the Hook—was conveyed to Gateway. (Tr. at 6034–6035).

### F. *The Damages Alleged by the City*

Michael Haberman is a real estate appraiser retained by the City to appraise the property occupied by the Schmitt Marina in Broad Channel and to estimate its "economic rental value." He appraised only the property the City contends is the non-leased occupied property, and not the 40,000 square feet of the leased property. Thus, Haberman appraised 258,000 of square feet of a total of 298,000 square feet.

Haberman visited the marina in 1996 and described the property:

A It is primarily a vacant, unimproved site which is bulkheaded. It has floating slips. It has a two-story commercial and residential dwelling, about 2,500 square feet. It has about an 800 square foot shed. And the remaining property, which is about 250,000 square feet, is basically unimproved, with wild bush growing on it, and a large part of it covered with boats.

(Tr. at 7869).

Haberman could not find a comparable lease and went into the marketplace and used nine sales of comparable marinas. Haberman testified that the Schmitt Marina, as presently constituted, was approximately six acres and the economic value per acre was between $200,000 and $250,000 depending upon the various dates and conditions. Haberman also considered the number of available boat slips. The basic unit was 250 slips, but this was substantially reduced in 1990 and to the present time by this court's preliminary injunction and the stipulation by the parties limiting the usage. Haberman's opinion as to the market value of the unleased portion of the Schmitt Marina is as follows:

| PERIOD | SUBJECT PROPERTY (×) | ECONOMIC UNIT (=) | MARKET VALUE |
|--------|----------------------|-------------------|--------------|
| 6/1/87 | 5.94 ac. | $200,000. Rd. | $1,188,000. |
| 6/1/88 | 5.94 | 225,000. | $1,336,500. |
| 6/1/89 | 5.94 | 250,000. | 1,485,000. |
| 6/1/90 | 5.94 | 250,000. | 1,485,000. |

For the period June 1, 1991 – June 1, 1993, when the Subject functioned without slips, economic units are reduced by 20%. Continuing the time trend and inclusive of this additional refinement produces the following market values:

| PERIOD | SUBJECT PROPERTY (×) | ECONOMIC UNIT (=) | MARKET VALUE |
|--------|----------------------|-------------------|--------------|
| 6/1/91 | 5.94 Ac. | $180,000. | $1,069,200. |
| 6/1/92 | 5.94 | 160,000. | 950,400. |
| 6/1/93 | 5.94 | 160,000. | 950,400. |

As of June 1, 1994 when the Subject again has boat slip utility (65 slips), an increment of 15% appears warranted to the stabilized June 1, 1993 unit value:

| PERIOD | SUBJECT PROPERTY (×) | ECONOMIC UNIT (=) | MARKET VALUE |
|--------|----------------------|-------------------|--------------|
| 6/1/94 | 5.94 Ac. | $185,000. | $1,098,900. |

Haberman testified that the aggregate use and occupancy charge owing to the City from the Schmitts for the unleased portion of the

Schmitt Marina from June 1, 1968 to June 1, 1996 is $2,900,190, excluding interest. (See summary in City Ex. AL–1 in the Appendix). This covers the extended 258,000 square feet of unleased land and does not include the 40,000 square feet comprising the leased marina.

The Court questions the evaluations by Haberman. First, the 258,000 square feet appraised is only an estimate given to Haberman by the City. There is no credible evidence that the unleased portion was of that size. Second, the fluctuating areas developed by the Schmitts and the use of the areas make any appraisal uncertain and speculative. Third, Haberman made no inquiries about the other existing marinas in Broad Channel and found no comparable sales involving Broad Channel marinas. Fourth, Haberman did not consider a number of marinas that were sold for substantially less than the figures Haberman espoused. Fifth, Haberman did not consider the fact that part of the property was in the bed of the streets and that there was no public water service and sewer service to the property. Further, Haberman did not consider the present actual rental being paid for the property. It is noted that Haberman's appraisal differs markedly with other appraisals done over the course of the years. The Court finds it strange that, when presented with other sales of City owned property in the area for substantially less money, Haberman adhered to his opinion. In the Court's view, Haberman's opinion that vacant land used for storing boats is worth from $160,000 to $250,000 an acre, is incredulous.

### G. *The Aerial Photographs*

In addition to the assistance afforded to the Court by the effort of four highly competent and hardworking attorneys, the Court's responsibilities have been greatly facilitated by the remarkably helpful aerial photographs introduced into evidence. These aerial photographs graphically demonstrate the use of the "Cove" and the area used by the operators of the Schmitt Marina. A chronological review of the area is in order.

In a series of aerial photographs the use of the Cove by the Schmitts was graphically demonstrated. The earliest aerial photograph is dated April 27, 1947 (Def.Ex.B–161). It shows the Cove surrounded by marshland with no clearly delineated Hook, apparently a very small dock attached to the western shoreline and small boats in the Cove. There are only scattered houses built on the streets in Broad Channel. The next aerial photograph is dated April 28, 1949 (Def.Ex.B–162)and shows essentially the same objects in the Cove as the 1947 photograph. A series of four aerial photographs, all dated April 19, 1954 shows what appears to be a long thin dock lying in a north-south direction in the westerly portion of the Cove, with no visible boats near the dock. In the June 24, 1959 aerial photograph (Def.Ex.B–169), the single long dock has a number of boats attached to it. In addition, the boats in the Cove appear to be moored in symmetrical lines. The Cove is still surrounded by marshland.

Curiously, by the May 6, 1960 photograph (Def.Ex.B–171), the long single dock has been shortened, with fewer boats affixed to the dock in the Cove. Yet on July 16, 1960, perhaps the height of the boating season, the photograph again shows the long single dock and the symmetrical mooring of many boats in the Cove. (*See* Def.Exs. B–173 and B–174). The same condition exists in the June 17, 1963 aerial photograph (Def.Ex.B–176), namely the single dock and the boats moored in the Cove in an orderly manner.

In the aerial photograph dated April 11, 1969 (Pl.Ex.24), the Cove is almost empty of all boats, the long single dock is gone and is almost empty of all boats. There appears a small dock attached to the land at the easterly border with several small white dots which may be boats in irregular fashion. This condition may be present because of the time of year, namely, April.

In the aerial photograph taken thirteen months later (Pl.Ex.17), on May 28, 1970, there is again increased activity in the Cove. The long single dock described above is back in place. As before, there are boat slips clearly visible attached to both sides of the dock and there are approximately 10 boats in the Cove, away from the dock. However, by 1984, there was considerably increased and different dock activity in the Cove. In the aerial photograph taken on August 8, 1984

(Pl.Ex.3), there were now four long docks in the Cove, each with many slips for boats on both sides of the docks.

The dock space in the Cove was again substantially increased by 1988. In the aerial photograph dated March 17, 1988 (Pl. Ex.46), there were now eight docks in the Cove, with one long dock extending from the southerly part of the Cove into the water north of the Cove.

## V. *CONCLUSIONS*

The Federal causes of action brought on behalf of the United States and the affirmative defenses and counterclaims of the Schmitts and the claims by the City will be reviewed and determined together. It is noted that a number of findings of fact have already been made by the Court, and some will be repeated in connection with the conclusions of law set forth below.

### A. *The Cove and the Hook*

■ To begin this discussion, the Court has already determined that the Cove and the Hook are within the territory ceded to the United States by the City in 1974 known as the Gateway National Park. Therefore, to use the area of the Cove for their docks, mooring buoys and boats, the Schmitts must have a permit from a United States agency. Since the Schmitts concede that they do not have a written permit, the Court must determine whether they are entitled to a Nationwide Permit. The Court finds that the Schmitts have a Nationwide Three Permit only for Dock A and its adjoining smaller dock, and for no other docks, buoys or other structures in the Cove. Thus, the Schmitts are entitled to a declaratory judgment permitting them to use Dock A and its smaller adjacent dock, in its state as of 1968.

With respect to the remaining myriad causes of action, counterclaims and third-party actions, the Court first will determine the claims of the Schmitts, then review the claims of the United States, and finally determine the claims of the City.

### B. *The Quiet Title Act of 1972 (28 U.S.C. § 2409A)*

■ In *Block v. North Dakota,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) the Supreme Court held that "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." Further, when there is a waiver of the sovereign immunity of the United States, the precise condition of the waiver must be strictly observed and exceptions are not to be lightly implied. *See e.g., Lehman v. Nakshian,* 453 U.S. 156, 160–161, 101 S.Ct. 2698, 2701–2702, 69 L.Ed.2d 548 (1981). When the waiver contains a statute of limitations, this is a condition of waiver which also should be strictly construed. *United States v. Kubrick,* 444 U.S. 111, 117–118, 100 S.Ct. 352, 356–357, 62 L.Ed.2d 259 (1979).

By their first counterclaim, the Schmitts request a declaratory judgment that they are in legal possession of the property they claim for the Schmitt Marina, including the Cove. The second Schmitt counterclaim seeks a finding that the Secretary of the Interior was without authority to accept title to any portion of the Schmitt Marina and asks for a declaratory judgment to reform the deed to remove title to the property of the Schmitt Marina from the United States. These counterclaims squarely implicate provisions of the Federal Quiet Title Act, which provides that:

> any civil action under this section ... shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).

By deed dated March 1, 1974, the City conveyed most of Jamaica Bay, its islands and the surrounding lands to the Federal Government for a national park to be called the Jamaica Bay Wildlife Refuge, a part of the Gateway National Recreation Area. The deed (Pl.Ex.5) set forth the boundaries of the grant in detail (Pl.Ex.41). The deed was recorded in the office of the Kings County Register on July 22, 1974. The Government contends that any action against the United States "accrued" on July 22, 1974, when the deed was recorded which "gave notice to the

world of this conveyance." (Government's Memorandum of Law at p. 53). In addition, the Government contends that "John Schmitt acknowledged at trial that he was aware of the Gateway Conveyance at the time of the conveyance because he had attended public hearings." (Government's Memorandum of Law at p. 55).

■ On the other hand, the Schmitts contend that the deed and the supporting documents indicate that the "Broad Channel Community" was to be excluded from the Gateway Conveyance and the exact boundaries of Gateway were not clear. Therefore, the Schmitts argue that they first knew of the claim of the United States when the Government commenced this action in 1989 and their counterclaims interposed in 1995, therefore are timely. The Court finds, for the reasons expressed by the Schmitts, that they proved, by a preponderance of the evidence, that their counterclaims attacking the title of the United States to the Cove did not "accrue" more than twelve years prior to the interposition of the counterclaims. Thus, the issues concerning title to the land and water at issue are not barred by the provisions of the Quiet Title Act.

### C. *A Resolution of the Area of the Schmitt Marina Leasehold*

■ The Court finds that the United States and the City have proven, by a preponderance of the credible evidence, as set forth in all the leases in evidence, that the Schmitt leasehold, occupied by the Schmitt Marina, is a 200 by 200 square feet piece of land, also described as 40,000 square feet, at the foot of West 20th Road at the point of its intersection with the mapped but unopened 96th Street.

The proof further reveals that this leased parcel is located wholly on land owned by the City. The Schmitts' leasehold, including the Schmitt Marina, is not located on Gateway National Park property. The Court already has related the history and the development of the boot-shaped Broad Channel Community. There are four leases in evidence between the Schmitts and the City covering their leasehold in Block 210 in the developer's map at the foot of West 20th Road. All of the leases clearly describe the leasehold as 200 by 200 square feet or 40,000 square feet at the foot of West 20th Road.

In this regard, the Schmitts and the City have stipulated that the bulkhead portion of the Schmitt Marina lies directly in the line of West 20th Road. This landmark establishes the location of the foot of West 20th Road as the area where the land and water meet, which is the westerly border of the Schmitt Marina leasehold. Thus, the Schmitt's 40,000 square foot parcel has access to the water and provides the Schmitts with the riparian rights necessary for the operation of a marina.

■ The Schmitts' contention that their 40,000 square foot leasehold, has been extended to more than 600,000 square feet by after-the-fact letters and oral representations by City officials, including the land underwater in the Cove, is without merit. None of this evidence would extend or create a viable lease. The only lease now in effect between the City and the Schmitts is referred to in the January 18, 1962 letter from the City to Adele, stating that the tenancy is "Block 210, foot of West 20th Road, Area 200 X 200 sq ft" and that "a lease is being drawn and will be forwarded for your signature." This lease is for the "Foot of West 20th Road—area— 40,000 sq ft" at a rental of $150 per month. (Copies of this lease are in evidence as Pl.Ex. 27 and City Ex. DO). The Court finds that the present rent of $229 is for the same parcel as set forth in the final April 16, 1962 lease.

The Schmitts also claim leasehold rights in Block 209, the block directly north of Block 210, bounded on the south by West 19th Road. This claim arises from their acquisition of "John's Fishing Station," a business formerly operated by John Orean and transferred to his grandson Daniel Pasienza. In addition, Adam obtained residential leases from the City for land in Block 209 beginning in 1969. These residential leases were included in Adam's purchase of the land from the City by deed dated June 24, 1988. John Schmitt testified that after Adam purchased John's Fishing Station, he closed the business and removed the docks in that facility.

(Tr. at 3596–3597). Although there is some confusion as to the Orean and Adam Block 209 leases, the Court finds that, other than the parcel conveyed to Adam, the City's books and records show that the other Block 209 leases have been terminated. (*See*, e.g., City's Exs. BV, BX and BY and Def. C and B–438). Certainly, the Adam Schmitt property can only be used for residential uses and the Schmitts concede that they have not paid any rent for any property on Block 209 since 1988 when Adam purchased his home. (Tr. at 4000–40003, 5924–5928). Thus, the former Orean lease is no longer in effect.

In sum, the Schmitts' only commercial leasehold is located on the City side of the Gateway National Park border and is known as the Schmitt Marina, whose dimensions have been previously determined in this decision. In this regard, the Court credits the testimony of Director Margo Moehring that the 200 X 200 square foot leasehold extends north of West 20th Road with some portion of the northeast corner of the square "continually under water." (See Def.Ex. B–149A). The areas to the south were leased to Mednica. As stated above, the Schmitt Marina and leasehold is entirely on the City side of the Gateway border.

■ As a result of a combination of inefficiency, bureaucratic morass and corruption on the part of the City employees and agents, coupled with aggressive trespasses and takings by the Schmitts, they substantially increased the size of their marina at Broad Channel from the validly leased 200' by 200' or 40,000 square feet to approximately 600,000 square feet. This represents an increase in their leased property 15 times the original area. The Court concludes that this occupation of the increased land and water was unauthorized. The Court also finds that the Cove and Hook were not within the original leased property. In addition, the Court determines that the Cove and Hook were conveyed by the City to the United States to form part of Gateway and presently are part of this national park.

#### D. *The Doctrine of Estoppel Does Not Lie Against the City*

■ The Schmitts point to certain letters and oral statements by various City officials, which, they contend, authorized the expansion of the Schmitt Marina. The Court finds that there is no evidence that the persons who wrote these letters and made the alleged oral representations had the authority to bind the City. Without exception, all of the City employees relied upon by the Schmitts lacked the authority to bind the City as to the leases in Broad Channel. These statements cannot bind the City as a matter of law, nor is the City estopped from denying such unauthorized representations. Certainly, they could not bind the Federal Government. In any event, most of these letters and statements do not specifically define the leasehold, but only concern what land is occupied by the Schmitts.

■ "Estoppel" generally means that one party in a dispute should not be permitted to reap any benefit from its own misrepresentations. The New York Court of Appeals has repeatedly held that estoppel will not lie against municipalities, public agencies or governmental subdivisions. In *Matter of Parkview Associates v. the City of New York*, 71 N.Y.2d 274, 525 N.Y.S.2d 176, 178, 519 N.E.2d 1372 (1988), *rearg. den.*, 71 N.Y.2d 995, 529 N.Y.S.2d 278, 524 N.E.2d 879 *app. dism. cert. denied* 488 U.S. 801, 109 S.Ct. 30, 102 L.Ed.2d 9 (1988), in which a developer was ordered to remove eleven stories of a building, it was stated:

[W]e have only recently once again said that "[g]enerally, estopped may not be invoked against a municipal agency to prevent it from discharging its statutory duties" (*Scruggs–Leftwich v. Rivercross Tenants' Corp.*, 70 N.Y.2d 849, 523 N.Y.S.2d 451, 517 N.E.2d 1337, citing *Matter of Daleview Nursing Home v. Axelrod*, 62 N.Y.2d 30, 33, 475 N.Y.S.2d 826, 464 N.E.2d 130; *Matter of Hamptons Hosp. & Med. Center v. Moore*, 52 N.Y.2d 88, 93, 436 N.Y.S.2d 239, 417 N.E.2d 533; *see also Matter of E.F.S. Ventures Corp. v. Foster*, 71 N.Y.2d 359, 526 N.Y.S.2d 56, 520 N.E.2d 1345). Moreover, "[e]stoppel is not available against a local government unit for the purpose of ratifying an administrative error" (*Morley v. Arricale*, 66 N.Y.2d

665, 667, 495 N.Y.S.2d 966, 486 N.E.2d 824).

*See also Granada Buildings, Inc. v. City of Kingston,* 58 N.Y.2d 705, 458 N.Y.S.2d 906, 907, 444 N.E.2d 1325 (1982) ("because a governmental subdivision cannot be held answerable for the unauthorized acts of its agents ... we have frequently reiterated that estoppel is unavailable against a public agency"); *Public Improvements, Inc. v. Board of Education of the City of New York,* 56 N.Y.2d 850, 453 N.Y.S.2d 170, 171, 438 N.E.2d 876 (1982) ("estoppel is unavailable against a public agency"); *Henry Modell & Co., Inc. v. the City of New York,* 159 A.D.2d 354, 552 N.Y.S.2d 632 (1st Dept.1990) *app. dism.* 76 N.Y.2d 845, 560 N.Y.S.2d 129, 559 N.E.2d 1288 (1990) ("those dealing with municipal agents must ascertain the extent of the agents' authority, or else proceed at their own risk") *Matter of Wood v. Cordello,* 91 A.D.2d 1178, 459 N.Y.S.2d 150, 152 (4th Dept.1983) ("Estoppel may not be invoked to prevent a municipality from disclaiming the unauthorized or unlawful act of its employees"); *Pauk v. Board of Higher Education of the City of New York,* 62 A.D.2d 660, 406 N.Y.S.2d 46, 49 (1st Dept.1978) *aff'd* 48 N.Y.2d 930, 425 N.Y.S.2d 92, 401 N.E.2d 214 (1979) ("a long, impressive line of cases ... has firmly established as fundamental the principle that one dealing with a municipality through its officials must take great care to learn the true nature of their power and authority. One relies on the self-asserted, naked representation of an official's power and authority to bind the municipality at one's peril").

Accordingly, even if the letters and oral representations allegedly enlarging the area of the Schmitt Marina were made, they could not bind the City or expand the written lease.

### E. *As to the Schmitts' Claims*

#### 1. *The Schmitts have failed to establish a due process violation.*

 The Schmitts contend in the State Court action that the City violated their right to procedural due process by seeking to terminate their leasehold interest. To prevail on a procedural due process claim, the Schmitts must allege facts demonstrating that the City deprived them of a protected property interest without affording constitutionally adequate procedures. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A legitimate claim of entitlement to a benefit may be derived from state laws or understandings that support claims of entitlement to certain benefits. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

Thus, in analyzing a procedural due process claim, the Court must first determine whether the Schmitts have a property interest protected by the Constitution. *See Roth,* 408 U.S. 564, 92 S.Ct. at 2702–03, 33 L.Ed.2d 548; *Narumanchi v. Board of Trustees,* 850 F.2d 70, 72 (2d Cir.1988), *cert. denied,* 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 246 (1991). If a protected interest is identified, the Court must next determine whether the City deprived the Schmitts of that interest without providing the constitutional minimum due process. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Narumanchi v. Board of Trustees,* 850 F.2d at 72.

 Here, at best, the Schmitts are month-to-month tenants. As such, they were subject to termination of their lease by a thirty-day notice under the provisions of New York Real Property Law § 232–a. A month-to-month tenancy, terminable at will by the service of a thirty-day notice cannot give rise to a "legitimate claim of entitlement" to remain in possession. Therefore, the Court finds that the Schmitts' lease or tenancy does not have a "property interest" protected by the Constitution.

 The Schmitts also contend that the enactment of the Broad Channel Conveyance Act of 1973, granting the Broad Channel leaseholders the "right" to purchase their leasehold from the City, affords them a

"property right." According to the Schmitts, the decision by the City not only not to sell them their leasehold property, but instead evict them without a notice or an opportunity to be heard, violates their procedural due process rights. The Court disagrees.

The right to purchase their leasehold property was a matter subject to administrative discretion. When an unsuccessful applicant to purchase leased property claims that the City has violated due process in rejecting it application, as stated above, the framework for evaluating the claim is the well-developed property interest analysis, which has its origins in the Supreme Court's decision in *Board of Regents v. Roth, supra.* The focus of this analysis is on the nature of the applicant's interest in the approval being sought, specifically whether the applicant has a clear entitlement to the approval sought from the administrative body. *See, e.g., RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911 (2d Cir.1989) (analyzing whether applicant possessed property interest in building permit), *cert. denied,* 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989); *Sullivan v. Town of Salem,* 805 F.2d 81, 84–85 (2d Cir.1986) (analyzing whether applicant possessed property interest in certificate of occupancy); *Yale Auto Parts v. Johnson,* 758 F.2d 54, 58–60 (2d Cir.1985) (analyzing whether applicant possessed property interest in permit to use property as automobile junkyard).

In *Yale Auto Parts,* 758 F.2d at 59, the Second Circuit held that a "legitimate claim of entitlement" exists where, "absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted." This test centers on the degree of discretion committed to the issuing authority, not the estimated probability that the authority would act favorably in a particular case. *See RRI Realty,* 870 F.2d at 918.

 The key to determining the existence of a property interest is the extent to which the deciding authority may exercise discretion in reaching its decision, rather than on the estimate of the likelihood of a certain decision. *Walz v. Town of Smithtown,* 46 F.3d 162 (2d Cir.) *cert. denied,* 515

U.S. 1131, 115 S.Ct. 2557, 132 L.Ed.2d 810 (1995); *RRI Realty Corp.,* 870 F.2d at 918. If the governing body has discretion in deciding whether to sell the leased land, the federal courts will not sit as a superseding body to the decisions of local administrative agencies. *See Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir.1995); *Sullivan,* 805 F.2d at 82. If there is an adequate property interest, the Schmitts must then show that the City acted in an arbitrary or irrational manner depriving him of that interest. *See Crowley v. Courville,* 76 F.3d 47, 52 (2d Cir.1996).

Of particular relevance to this analysis are the Second Circuit's decisions in *Walz* and *Crowley.* In *Walz,* the town code provided that upon the satisfaction of certain threshold requirements, namely that permit applications be filed in writing and contain specified information, "a permit *shall* be issued in the name of the Superintendent of Highways of the town of Smithtown." *Walz,* 46 F.3d at 168 (emphasis added). Relying on this mandatory language, the Court held that the Superintendent had "no discretion to decline to issue a permit" where the application contained the required information. As a result, the plaintiffs had a property right in the permit sufficient to invoke the due process clause. *Id.*

In *Crowley,* however, the Court reached the opposite conclusion. In that case, the Zoning Board had discretionary authority to grant variances where "there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter [of the regulations]." *Crowley,* 76 F.3d at 52. The regulations further contained "[g]uiding principles" for the exercise of authority, including a provision that "[e]very variance granted by the [Zoning Board] may be made subject to such conditions and safeguards as the Board shall deem to be applicable to the particular case." *Id.* Relying on the discretion provided to the Zoning Board under these provisions, the Second Circuit held that the plaintiff did not have a sufficient property interest to maintain a substantive due process claim. *Id.*

Applying these standards, the Court finds that the plaintiff's due process claim is closer to *Crowley* than *Walz.* The Broad Channel

Conveyance legislation provides for the sale of City property on Broad Channel only to tenants of "good standing." The language in the legislation is not mandatory, and directs that the City sell the leased property only in the event that certain predicate requirements are satisfied. Accordingly, the Court finds that under Chapter 756 of the Laws of 1973, the City retained sufficient discretion with respect to the decision to sell, so as to defeat the Schmitts' due process claim.

### 2. The Schmitts Have Failed to Establish Either an Equal Protection or Selective Enforcement Claim.

The Court concludes that the Schmitts abandoned these issues by failing to mention, much less address them in either of their memoranda of law. Regardless, their claims are unavailing. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). The Schmitts' equal protection claim is not a challenge to the state statute itself, but rather an attack on the purported "selective enforcement" of the Act. It has been held that selective enforcement is a "murky corner of equal protection law in which there are surprisingly few cases," *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir.1980) *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Nevertheless, the Second Circuit ruled that such a claim is proper when it is established that: (1) the person, compared with other similarly situated, was selectively treated; and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. *Zahra v. Town of Southold, supra; FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir .1992); *accord La Trieste Restaurant & Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994); *Terminate Control Corp. v.*

*Horowitz*, 28 F.3d 1335, 1352 (2d Cir.1994); *LeClair*, 627 F.2d at 609–10.

Upon reviewing the record and considering the evidence, the Court concludes that the Schmitts failed to establish an equal protection violation, as a matter of law. The Schmitts failed to prove that the land was not sold to them because of their race, religion, or to prevent them from exercising a constitutional right. Nor is there any evidence in the record of a malicious or bad faith intent to injure. *See, e.g., FSK Drug,* 960 F.2d at 10; *LeClair,* 627 F.2d at 610.

Further, there is a rational relationship between the decision not to sell the land to the Schmitts and the legislative purpose. The decision not to sell to the Schmitts and to terminate their leasehold was taken when the City learned that the Schmitts substantially encroached on City-owned land; apparently violated both federal and state environmental statutes; and breached their obligations under the lease. The Broad Channel tenants who were permitted to purchase their leasehold property had no such major impediments. Accordingly, the Schmitts' constitutional claims based on equal protection and selective enforcement are dismissed.

### 3. As to the Schmitts' "Taking" Claim

The thrust of the Schmitts' "taking" claim seems to be that the City deeded portions of the Schmitt Marina property to the United States as part of Gateway, and that the City "was not authorized to convey any portion of the Schmitt Marina property to any person or entity other than the Schmitts" (Third party complaint, sixth cause of action, ¶ 61).

Initially, the Court notes, as stated above, the Schmitts do not have an enforceable property interest which would support a claim of an "unjust and unlawful taking by the City of New York" (Third amended complaint, sixth cause of action, ¶ 70). Second, even if Broad Channel tenants acquired any enforceable rights to purchase their land as a result of the Broad Channel Conveyance Act, those rights could not have vested prior to 1981, when the Board of Estimate began

issuing enacting resolutions. The Gateway Conveyance occurred in 1974, seven years earlier. Accordingly, the conveyance to the United States by the City could not have constituted a "taking," as a matter of law. Moreover, the New York State Gateway Act (Laws of 1973, Ch. 759) trumped the Broad Channel Conveyance Act in that the Gateway Act authorized conveyance of land for Gateway "notwithstanding any inconsistent provision of law." Finally, any "taking" claim occurred in 1974, at the time of the conveyance to the United States and is time barred under the six year residual statute of limitations. See CPLR 213(1). Thus, the sixth cause of action in the third party complaint premised upon a "taking" by the City is dismissed.

### 4. *The Schmitts' Second Cause of Action to Reform the Deed from the City to the United States.*

█ In this cause of action, the Schmitts contend that the lands occupied by the Schmitts are part of the "Broad Channel Community" which is excluded from the Gateway conveyance. This contention is without merit.

The City and the Federal Government had the right to determine between them the appropriate boundaries for the Gateway Conveyance and the Broad Channel exclusion. The boundaries of the Gateway Conveyance are set forth in Pl.Ex. 38–B–1, Map 4030. As stated above, the Court credits the testimony of Andrew Karn, the City Planning Engineer who actually supervised the creation of the conveyance maps, that the unshaded toe of the boot—the Big Egg Marsh—was included in the Gateway Conveyance. Indeed, this boundary interpretation is reasonable in that it places in Gateway those portions of the boot which have never been inhabited or developed, and which remain wetlands and suitable breeding and nesting grounds.

█ Even if the claim was factually supported, which it is not, the Court would conclude that it is barred by the statute of limitations. A cause of action for reformation of a deed is subject to the six year limitations set forth in the omnibus provision of CPLR

213(1) ("an action of which no limitations is specifically prescribed by law"). This statute governs actions in equity, such as a claim to reform a deed. A cause of action for reformation of a deed is governed by the six year limitation in CPLR 213(1) and, except in cases of fraud, begins to run from the date of delivery of deed. *Incorporated Village of Island Park v. Island Park–Long . Beach, Inc.*, 81 N.Y.S.2d 407 (S.Ct. Nassau Co.), *aff'd* 274 A.D. 930, 83 N.Y.S.2d 542 (2d Dept.) *rearg* and *app denied* 274 A.D. 994, 85 N.Y.S.2d 510 (2d Dept.1948); see also *Dubin v. Muchnick,* 108 Misc.2d 1042, 438 N.Y.S.2d 920 (Sup.Ct.N.Y.1981) mod. on other grounds 87 A.D.2d 508, 447 N.Y.S.2d 472 (1st Dept. 1982). Accordingly, the Schmitts' second cause of action is dismissed.

### 5. *As to the Schmitt's Third Cause of Action Based on Adverse Possession.*

In this claim, the Schmitts asserted title to the land they occupy under the doctrine of adverse possession. By a letter to the Court from Burton Citak, Esq., a counsel for the Schmitts, dated June 9, 1993, this cause of action has been withdrawn.

### 6. *As to the Schmitts' Fourth Cause of Action Sounding in Fraud*

This claim is based on the false representations by City officials over the years concerning the area covered by the Schmitts' leasehold. These representations during the period in the 1960s through the 1990, were that "the Schmitts leased or occupied land covered (sic) an area in excess of 220,000 sq. ft. and/or approximately 600,000 sq. ft." (Third Party Complaint ¶ 51). The third party complaint further alleges that "as a result of which the Schmitts were induced to and did enter into certain lease agreements with the City of New York basing the rent amount paid and to be paid on the representations regarding the extent of the area of the leased property". The Schmitts assert that they would not have entered into lease agreement for the agreed upon rent with the City of New York except for their reliance upon the false representations of the City. The Schmitts further contend they relied on the City's representations, occupied

and worked the land, built a business and enhanced the Broad Channel Community and as a result "the Schmitts have been damaged in the amount of ten million ($10,000,000.00) dollars."

At first blush, this argument is ludicrous. Here the Schmitts have occupied in excess of 600,000 square feet of City land as a result of aggressive unauthorized acquisition of all the property except their original 40,000 square feet, all of this at a minimal rental. Now they claim they were induced to do so by fraudulent misrepresentations. This claim is totally without merit and borders on being frivolous.

Initially, the Court notes that John Schmitt testified that contrary to the allegations in his complaint, the Schmitts were not fraudulently induced to enter into any leases. After the pertinent paragraphs of the third party complaint were read to him, John stated that "I don't believe we were fraudulently induced to enter any lease, if that is what you are asking." (Tr. at 6217). In addition, a condition precedent to pursue the tort of fraud against the City requires that the Schmitts file a notice of claim, which they apparently failed to do. See General Municipal Law § 50–e(1)(a). Also, most, if not all of their allegations of fraud are barred by the one year and ninety day limitation period. See New York General Municipal Law § 50–1(1)(e).

As to the plethora of claims made by the Schmitts under the fraud rubric, none are meritorious. The City had an absolute right to convey the Big Egg Marsh portion of Broad Channel, including the Cove and the Hook, to the United States as part of Gateway. This conveyance would not support a fraud cause of action even though the Schmitts claim to be the only Broad Channel tenant whose leasehold was conveyed, especially as a result of the dispute and confusion with regard to the exact location of the Schmitt Marina. None of the unauthorized misrepresentations of the City officials, whatever their motive, could support a fraud claim against the City. The claim that the City's view of the Schmitt Marina has grown smaller over the years, is unsupported by the evidence, and, in any event, would not support a fraud claim.

The Schmitts also claim that they were the only Broad channel tenant who were denied an opportunity to purchase their leasehold the Court already has determined that the Schmitts have no viable equal protection or selective enforcement claim. Even if this assertion of such sole exclusion is true, it could not form the basis for a cause of action in fraud. Moreover, the acts established at this trial, the substantial encroachment on City-owned land, the violation of state environmental statutes, the unauthorized destruction of national park land, and the violation of federal law, as will be set forth later, are ample rational reasons to support the decision to deny the Schmitts of the benefit of the right to purchase the leased property.

The Schmitts were granted a permit to construct a new dock facility in the water for 120 slips in front of Adam's home on West 19th Road on June 7, 1994. The permit itself stated that it was for the "rearrangement of existing floats as per Plan # 7374." (Def.Ex.B–507). This permit was revoked by the Department of Business Services on July 18, 1994 on two grounds. First, the property described in the permit is owned by Adam as residential property, and any use for a commercial marina would constitute a nonconforming use of the property in violation of the R3–2 zoning. Second, the permit inadvertently authorized the installation of *additional* docks for 120 craft, when the permit was intended to authorize only the *replacement* of docks legally existing in the marina. (Def.Ex.B–508).

In this regard, the Schmitts point to other marinas in Broad Channel who did obtain permits for docks or floats. The Court finds that Adam purchased this property in 1988, six years prior to the date of his permit application, and had no docks in the water on that area since 1968, 26 years prior to the permit application. Therefore, there can be no grandfathered rights to the commercial use of that property. Further, the revocation of this permit was mandated by law, based on a rational basis and could not be the basis for a fraud claim.

The Schmitts also claim that the water supply to their home was shut off and the City refused to "hook up" the Schmitts to the newly installed sewer system. As to the water supply, the City repaired it several times. Also, the City sent the Schmitts a license agreement (Def.Ex.B–489) under which the Schmitts would be permitted to enter into City property and repair the water line, but the Schmitts refused to sign this agreement. As to the claim that the City refused to "hook up" the Schmitts to the newly installed sewer system, the City does not "hook up" anyone to the sewer mains. That task is imposed on each individual owner or tenant, and, in that regard, the Schmitts have been treated no differently than any other Broad Channel resident.

The Schmitts' fraud cause of action is dismissed in its entirety as factually and legally baseless.

### 7. As to the Schmitts' Fifth Cause of Action Asserting a Breach of the Covenant of Quiet Enjoyment

The Court need not tarry long with this cause of action. First, the Schmitts failed to prove that there was any actual or constructive eviction from any part of their leasehold, even when measured by their grandiose version of the boundaries of their property. Second, the allegations in the third party complaint allege a "superior right of possession ... (and) title" by the United States. In fact, *there appears* to be no claim that the City violated the implied covenant of quiet enjoyment. Nor, as stated above, can the Schmitts rely on the "shut off" of their water or the revocation of their permit for docks in front of West 19th Road. Accordingly, the Schmitts' fifth cause of action in the third party complaint based on a breach of the covenant of quiet enjoyment is dismissed.

### 8. The Schmitts' Conspiracy Claim

Initiated by a letter dated April 18, 1988, from Michael and Mary Flynn, the Schmitts' neighbors (Pl.Ex.14), to a number of City and Federal agencies, eventually involving the area congressman, the City Fire Department and the State DEC, numerous investigations of the Schmitt Marina activities and "place in the sun," were instigated. A meeting between City, State and Federal agency representatives occurred on October 25, 1988. An agreement was arrived at that additional information was needed, and the various agencies agreed to keep each other informed. Not only is it not unusual for the various jurisdictions and agencies to work together, but it would be an obvious waste of resources and a departure from accepted practice to do otherwise. That governmental and regulatory agencies acted in accordance with their duties in response to a citizen's complaint, is not evidence of a conspiracy. Stated simply, there is no evidence of a conspiracy and that cause of action is dismissed.

### 9. The Schmitts' Supplemental Third–Party Complaint Based on the 1995 New York State Broad Channel Conveyance Act

██ This cause of action was advanced by the Schmitts in 1996, during the pendency of this trial. The Schmitts seek a judgment declaring that they have a right to purchase their leasehold and adjacent property pursuant to the 1995 State Broad Channel Conveyance Act and ask the Court to direct the City to sell such property to them. Initially, the Court notes that the Schmitts' claims under this 1995 legislation may not be ripe for adjudication. Moehring testified without refutation, that the City has not yet completed the legally mandated public review process, nor has the City yet determined the terms of the sale. (Tr. at 6829–6830). However, assuming that this obstacle was not present, the Schmitts cannot prevail under this supplemental statutory cause of action.

A review of the new legislation reveals that it provides no new rights to the Schmitts. The City is vested with ample discretion to sell the Broad Channel property to certain designated lessees, tenants or occupants in possession. The Act provides that the Mayor "may authorize the sale" of City-owned property in Broad Channel to three categories of potential purchasers.

By the terms of the 1995 statute, similar to its predecessor, sales of leased and adjacent properties is at the discretion of the City. Under the provisions of this statute, the

Schmitts remain confronted with the problems of the true dimensions of their lease and whether they are tenants in good standing. There is a provision stating that the occupants and owners of improvements can obtain the right to purchase, only if the land was leased as of August 19, 1982 and the tenant cannot be found. Most of the land claimed by the Schmitts were not leased in August 19, 1982, except for the original 40,-000 square foot area. However, with regard to the land formerly leased to Carl Mednica and now occupied by the Schmitts, they failed to prove that he "cannot be found" and the Schmitts can obtain no new rights, under the 1996 legislation, with regard to the Mednica leasehold.

Viewing this supplementary complaint in the light most favorable to the Schmitts, at best, this claim is premature, and the supplemental third party complaint is dismissed.

### 10. *As to the Damages Claimed by the Schmitts against the City*

In addition to the grounds for dismissal set forth above, the Schmitts have to contend with the settled rule that the City's administrative determinations not to sell the leased land to the Schmitts and to evict them, must, generally, initially at least, be judicially reviewed. In this case, the Schmitts have included most of their present claim in their mandamus petition in the State Court action, which petition was dismissed. Under the doctrine of *res judicata,* the Schmitts may not relitigate these issues. *Cornwall Warehousing Inc. v. Town of New Windsor,* 238 A.D.2d 370, 656 N.Y.S.2d 329 (2d Dept.1997); *Brooklyn Welding, Corp. v. The City of New York,* 198 A.D.2d 189, 604 N.Y.S.2d 87 (1st Dept.1993); *Patsy Bello Nurseries, Inc. v. The City of New York,* 94 A.D.2d 722, 462 N.Y.S.2d 258 (2d Dept.1983).

In addition, the Schmitts proffered no evidence of monetary damages for any of their claims. For example, the claim that the Schmitts are the only Broad Channel tenant not to have an opportunity to purchase, even if true, would not support a claim for monetary damages, there being no evidence to support such a claim. Nor can damages be awarded for the loss of the expectancy that

some day in the future the Schmitts may have the opportunity to purchase their leasehold. Indeed, the very size of the marina was a source of dispute and is just now resolved in this opinion. Accordingly, all of the monetary damages claims by the Schmitts against the City are dismissed.

### F. *As to the Claims Involving the United States*

### 1. *The Schmitts' claim that the boundaries of Gateway and/or Broad Channel were drawn in an arbitrary and capricious manner.*

The review of an administrative agency's interpretation of its own enabling legislation and its own determination, is based on whether it is arbitrary and capricious, or contrary to law. This standard is highly deferential to the agency. The Second Circuit stated the rule in *Henley v. Food & Drug Administration,* 77 F.3d 616 (2d Cir.1996), as follows:

> An agency rule may be deemed arbitrary, capricious or an abuse of discretion "if the agency has relied on factors which congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also New York Council, Assoc. of Civilian Technicians v. Federal Labor Relations Auth.,* 757 F.2d 502, 508 (2d Cir.), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985).

The scope of judicial review is narrow and deferential. As long as the agency has considered all important aspects of the issue and stated a rational explanation for its choice, it will be sustained. Certainly, a reviewing court cannot "substitute its judgment for that of the agency," *Citizens to Preserve Overton Park Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

In this case, there is no evidence that the agencies involved did not consider all the important aspects of the Gateway Conveyance and its boundaries. In addition, the Congressional purpose in enacting this important legislation was to preserve the marshes in the Bay in their natural state, and to nourish and sustain the myriad of wildlife dependent on Jamaica Bay as a wildlife preserve. In particular, the Big Egg Marsh is one of the largest surviving natural marshlands in Jamaica Bay. Dr. John Tanacredi, Gateway's Research Ecologist and Chief of the Division of Natural Resources and Environmental Compliance of the National park Service testified that the 17,000 acres of bay bottom and marshland of the Jamaica Bay Wildlife Refuge constitute the largest open space in New York City. This area comprises 95 percent of all the open space in the City. He testified that the Big Egg Marsh is a stopover along the Atlantic Flyway, the major migratory route for birds along the Atlantic coastline.

Dr. Tanacredi predicted that if the Big Egg Marsh was eliminated by development, the migratory birds which nest and breed in it also will be eliminated. In addition, the Big Egg Marsh serves the important purpose of cleansing the waters of the bay. Also, the Big Egg Marsh is the home of a large variety of small mammals, terrapins, snakes, frogs, salamanders and butterflies, in addition to 326 species of birds, including the egrets, terns, bald eagles, ospreys and peregrine falcons and hundreds of fish species. The creation of Gateway was not only rational, it was commendable.

■ Accordingly, the Schmitts failed to prove that the boundaries of Gateway, which include the Big Egg Marsh and the Cove and the Hook, were drawn in an arbitrary and capricious manner or are contrary to law.

## 2. *The Trespass Claim by the United States Against the Schmitts*

The United States and the City established the boundaries of Gateway, the Jamaica Wildlife Refuge and the Broad Channel Community exception to the Gateway Conveyance. As stated above, the Court has found that the United States proved that the Big

Egg Marsh, including the Cove and Hook, were included in Gateway and not included in the Broad Channel exemption. Thus, after 1974, the date of the Conveyance, the Schmitts could not legally construct or maintain docks on national park bay bottom lands without a permit from the Secretary of Interior.

Prior to 1974, when Gateway was established, the Schmitts had a single dock in the water. That one dock, known as Dock A, is grandfathered in on the national park land. However, the Schmitts could not build any new docks after 1968 without a Rivers and Harbors Appropriation Act permit, or after 1972 without a Clean Water Act permit or after 1974 without a National Park Service permit.

That Congress has the power to protect public land is a given precept. Under the delegation of Congress, the Secretary of the Interior has been given the responsibility to manage the public wildlife lands. The courts have consistently upheld the power of the Secretary of Interior in the management of public lands. "The Secretary of the Interior is responsible for maintaining our national parks ..." *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm.,* 393 U.S. 186, 187, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968). This power includes the right to restrict the riparian rights of property owners abutting a national park. As stated in *Stupak–Thrall v. United States,* 843 F.Supp. 327, 331 (W.D.Mich.1994); "Riparian rights are not, however, absolute rights. They may be regulated under the police powers of governmental units."

The National Park Service clearly has the discretion to prevent new dock construction and the filling of marshes on Gateway property. The Cove and the Hook are Gateway property and the National Park Service has the right to prevent the proliferation of docks by the Schmitts in the Cove, with the exception of Dock A and the 20 foot raft for landing passengers, in which the Schmitts have grandfathering and national permit rights. The Schmitts added up to eight new docks in the Cove without authority or per-

mission. They could not remain on Gateway property.

In addition, in 1976, with the help of Adam's friend Mednica, the marshlands comprising the Hook was covered with hundreds of tons of construction debris to create a riprap wall and access road.' This wall was build to shelter the boats in the cove from storms. The latest photographs show that the entire Hook around the Cove is solid land. Gone, perhaps forever, are the marshlands and vegetation, fish and animals formerly living in that marshland.

■ Accordingly, the Government has established, by a preponderance of the evidence, that the Schmitts have trespassed on Gateway property. As to damages, the record reveals that the United States has not offered any proof of monetary damages, *per se*. The remedy for this violation will be discussed later in the opinion.

### 3. *The Rivers and Harbors Appropriation Act Claim*

This part of the Rivers and Harbors Appropriation Act of 1899, never amended, provides as follows:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; *and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty or other structures in any* port, roadstead, haven, harbor, canal, navigable river, *or other water of the United States,* outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful *to excavate or fill, or in any manner to alter or modify capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge,* or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the

Secretary of the Army prior to beginning the same.

33 U.S.C. § 403 (emphasis supplied).

Similar to the findings at the 1990 preliminary injunction hearing, the Court finds that Jamaica Bay and the Cove are within navigable waters as defined in the Corps of Engineers regulations, as follows:

Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

33 C.F.R. § 329.4.

Dr. Arthur LaPerriere, then Chief of Harbor Supervision, New York Region, Army Corps of Engineers, testified that Jamaica Bay and the Schmitt Marina are in navigable waters. He testified that Jamaica Bag is a waterway used to transport interstate and foreign commerce. (PI Tr. 66–67, 1029–1030, 1236–1239, 1252–1257). The Court credits this testimony.

With regard to Schmitts' claim of a Nationwide Permit, the United States contends that the Schmitts' docks interfere with navigation and therefore violate the provisions of 33 C.F.R. § 330.3(b), which covers Nationwide Permits involving "structures or work completed before December 18, 1968 [provided] there is no interference with navigation." Even assuming that the Schmitts' docks do not interfere with navigation, the United States proved that Dock A was the only one constructed in the Cove prior to December 18, 1968. As shown in the photographs in evidence, this single dock is approximately 175 to 200 feet in length, 8 feet in width and runs parallel to 96th Street, and to the west line of the marina, closest to the shore. In addition, the photographs show that there was a second structure approximately 20 feet long and 8 feet wide which appears to be a raft attached to pilings. These two structures, together with the bulkhead adjacent to

the house and Dock A, have a Nationwide Permit.

 Also, the Schmitts are authorized under the Nationwide three Permit to repair, rehabilitate or replace Dock A, its appurtenances and the bulkhead close to the house and dock, without the need for any additional permit. The Court finds that all of the subsequently constructed docks in the cove, believed to be eight in number, are not covered by this Nationwide Permit and, therefore, the presence of these docks violate the Rivers and Harbors Appropriations Act. In addition, as stated above, the Court agrees with the Government that the mooring buoys or pilings in the Cove prior to December 1968 are not "docks" for the purpose of a Nationwide Permit. In this regard, the Court declines to "substitute its judgment for that of the Agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

 Further, as already considered by the Court, the United States proved that the Cove is not an artificial canal within the meaning of Nationwide Permit 33 and C.F.R. § 330.5(a)(2), which provides for such a permit with regard to: "Structures constructed in artificial canals within principally residential developments where the connection of the canal to a navigable waters of the United States has been previously authorized." (See 33 C.F.R. § 322.5(g) [Definition of a canal]).

Stated simply, the Cove is not an "artificial canal" in a "principally residential development." To the contrary, the Schmitt Marina is a commercial enterprise, as was the Mednica leasehold. Also, the Cove is an artificial hole or depressed area created by the extraction of fill to build the Broad Channel Day Camp. It was not intended to be a "canal." The distinction between a "canal" and the Cove can be seen in viewing the narrow canals that run in an east-west direction between Cross Bay Boulevard and Jamaica Bay. Further, as already stated, the Cove is not in a "principally residential development." It is bounded by wetlands and marshes, except for the riprap wall created by Mednica and the Schmitts. For these reasons, the Cove is not a "canal" for Nationwide Permit purposes.

In sum, the burgeoning nine docks in the cove, together with the mooring buoys and pilings and the riprap wall replacing the marshland around the Cove constituted obstructions to the navigable capacity of these waters within the Gateway National Park, in violation of the Rivers and Harbors Appropriation Act. The remedy for this violation will be discussed later in the opinion.

### 4. *The Clean Water Act Claim*

The Federal Clean Water Act provides in relevant parts:

> The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

33 U.S.C. § 1344(a).

> Except as in compliance with ... sections ... 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

33 U.S.C. § 1311(a).

In addition, 33 C.F.R. § 323.3(a) provides:

> Except as provided in § 323.4 of this Part, [Department of Army] permits will be required for the discharge of dredged or fill material into waters of the United States.

The Clean Water Act makes it unlawful to discharge fill material into the waters of the United States without a permit from the Army Corps of Engineers. The United States District Court has jurisdiction to require compliance with the Act:

> The Secretary [of the Army] is authorized to commence a civil action or appropriate relief including a permanent or temporary injunction for any violation in which he is authorized to issue a compliance order under paragraph (1) of this subsection. Any action under this paragraph may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance.

33 U.S.C. § 1344(5)(3).

The United States contends that the shoreward limit of the Army's jurisdiction is the

"spring high tide" (§ 328.3[d]) which would include the wetlands and the tidal marshes of the Big Egg Marsh which is subject to periodic flooding by the tides, supporting vegetation and marsh grass. It further asserts that the Schmitts have violated the Clean Water Act by causing concrete and asphalt debris to be dumped in the Big Egg Marsh on the Hook; by building eight new docks in the Cove; and by adding additional fill to the west shore along 96th Street in front of the new Schmitt combination home and office.

On the other hand, the Schmitts deny that they violated the Clean Water Act. First, the Schmitts deny that they were responsible for the dumping of fill in the Hook. That factual issue has already been decided by the Court against the Schmitts. Next, the Schmitts contend that any dumping of fill on wetlands above the high water line prior to July 1975 did not violate the Clean Water Act. The Court need not decide this issue since it has already found that the dumping on and fill of the Hook occurred, at least in part, after July 1975, and in any event, this dumping occurred in waters below the high water line and was not affected by the July 27, 1975 statute.

■ The Court finds the Government proved, by a preponderance of the evidence, that the Schmitts violated the Clean Water Act only with regard to the dumping of fill on the Hook. The Court further finds no violation of the Clean Water Act with regard to the eight additional docks or the filling in of the shore along the westerly side of 96th Street. The latter filling apparently did not violate the 1972 statute and probably was grandfathered in with regard to the 1975 statute. Again, the remedy for this violation will be discussed later in the opinion.

### G. *As to the Claims of the City of New York*

1. *First Counterclaim—Use and Occupancy*

The City's first counterclaim is for a money judgment with regard to the Schmitts' use and occupation of City-owned lands not leased to them. The City's expert, Michael Haberman, testified that the Schmitts occupied approximately 298,000 square feet based on a survey performed by Emanuel Bernstein. (Tr. 7338–7399). Excluding the 40,000 square feet which is their only leased property, Haberman appraised the additional 258,000 square feet illegally occupied by the Schmitts. Without reviewing all his computations, which was previously done in this opinion, Haberman testified that the monetary value of the City's use and occupancy claim from 1968 to 1996 for the wrongfully occupied area was the total amount of $2,900,190. This estimate was based on sales of nine allegedly comparable units and was adjusted for size and location. The 1968 starting date was based on the Schmitts' assertion that the marina reached its present size at that time.

■ Initially, the Schmitts respond that the City's acceptance of rent from them with knowledge of the alleged violations or defaults waived all objections to their continued tenancy. The Schmitts fail to recognize the foundation for such a waiver theory. As they correctly cite in their Westfal memorandum of law, "When rent is accepted with knowledge of particular conduct which is claimed to be a default, the acceptance of such rent constitutes a waiver by the landlord of the default." *Atkin's Waste Materials, Inc. v. May*, 34 N.Y.2d 422, 426, 427, 358 N.Y.S.2d 129, 132, 314 N.E.2d 871 (1974). The New York Court of Appeals in *Atkin's* went on to say that "The acceptance of rent is in effect an election by the landlord to continue the relationship of landlord and tenant." *Id.* 358 N.Y.S.2d at 132.

■ In this case, the acceptance of the monthly rent by the City, continued the landlord-tenant relationship as to the written leasehold, namely the 40,000 square feet at the foot of West 20th Road. The acceptance of rent under the terms of the written lease did not create a new lease, one of a claimed 600,000 square feet. A waiver is an intentional abandonment or a relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed. *Wolff & Munier, Inc. v. The Whiting–Turner Contracting Co.*, 946 F.2d 1003 (2d Cir.1991). In effect, the Schmitts claim that, by accepting the rent under the written lease of 40,000

square feet, the City consented to their tenancy of an additional huge amount of land. The Court disagrees with this contention. Despite the verbal and written statements by City representatives who were without authority to bind the City and without the benefit of a written lease, the receipt of the rent on the 40,000 square feet leased property gives the Schmitts no right to the additional property, based on a waiver doctrine. As stated in *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295 (2d Cir.1996), "There is no waiver where the failure to exercise this right was the result of negligence, oversight or thoughtlessness." *See also Agati v. Agati*, 92 A.D.2d 737, 461 N.Y.S.2d 95 (4th Dept.) *app. den.* 59 N.Y.2d 830, 464 N.Y.S.2d 743, 451 N.E.2d 490 (1983). Here, by accepting rent under the written lease, there was no intentional waiver by the City of the right to contest the Schmitts' improperly occupied additional land.

■ However, by the acceptance of the monthly rent by the City to the present time, there was a waiver of the alleged violations or defaults by the Schmitts as to the land described in the written leases, namely the 200' by 200', 40,000 square feet at the foot of West 20th Road. Stated simply, the Schmitts are entitled to the possession of the 40,000 square foot written leasehold, subject to a future eviction proceeding, if any, as to defaults not nullified by a waiver.

■ Moreover, the Court agrees with the Schmitts (*see* Westfal memorandum of law at 55, 56) that the testimony of Haberman that the fair rental value of the illegally occupied property, since 1968 is the sum of approximately $2,900,000, with a yearly rental value in excess of $110,000, is unbelievable and this opinion is rejected. The City was apparently content with a rental of $239 per month for 40,000 square feet, and the figures mentioned by Haberman simply are not credible. The Court finds that there is no believable evidence in the record as to the rental value of the occupied land. Accordingly, the City's first counterclaim to recover for the use and occupancy of the wrongfully occupied City property, is dismissed.

### 2. *Second Counterclaim—to Restore the City-owned Land*

■ In the second counterclaim, the City seeks a judgment directing the Schmitts to remedy the filling and dumping on City-owned land in the vicinity of the Schmitt Marina. As to the 40,000 square feet in the leased premises, the City has failed to prove any condition that needs to be restored. With regard to the huge areas of land upon which the Schmitts have trespassed all these years, the Court finds that the City failed to prove, by a preponderance of the credible evidence, in what manner and to what extent the Schmitts have filled or dumped. Certainly, the City failed to prove any monetary damages to the City for such actions by the Schmitts. The Schmitts are trespassing and will be removed from the property illegally occupied. The City failed to prove that any of the City-owned property wrongfully occupied by the Schmitts requires restoration. The Schmitts' obligation to restore is limited to the United States owned property on the Hook. Accordingly, the City's second counterclaim is dismissed.

### H. *The Schmitts' Request to Compel the City to Sell to Them the Leased Property*

The Court determines that the City has the right to decline to sell any of the City-owned land to the Schmitts. The City's determination that the Schmitts are not tenants of good standing is supported by the record. This decision by the City is rationally based on the Schmitts' many violations as set forth in this decision, including the major trespass violation; the usurpation of the Cove; the unauthorized expansion of the network of docks; and the dumping and filling of the natural marshlands in the Hook and elsewhere. Indeed, it is very understandable under the remarkable circumstances in this case.

### I. *As to Carl Mednica*

The Court finds that, together with the Schmitts, the defendant Carl Mednica was responsible for filling the Hook during the mid 1970s. There is joint and several liability on the part of the Schmitts and Mednica to restore the Hook.

## VI. *THE REMEDIES*

The most difficult part of this decision is to determine the remedies resulting from the many determinations made by the Court. These are the initial determinations resulting from the Court's finding of fact and conclusions of law:

1. The Schmitts have the right to maintain possession of the 200′ by 200′, 40,000 square foot piece of land at the foot of West 20th Road, until the City properly acts to evict, if desired.

2. The City and the Schmitts are directed to survey this 40,000 square foot piece of land so as to delineate and firmly fix the boundaries. The method of doing this will be discussed at the April 24, 1998 conference referred to below.

3. The Schmitts are to vacate all the other property in Broad Channel presently occupied by them or as the Schmitt Marina, except as to Dock A and the adjoining dock, within sixty days of the date of this decision.

4. The Schmitts have the right to use Dock A and the smaller adjacent dock.

5. The Schmitts are not to place, use or maintain any other docks, mooring buoys or piles in the Cove.

6. The Schmitts and Carl Mednica are directed to restore the Hook to its condition prior to the creation of the riprap wall or compensate the United States for the cost of such restoration. The manner in which this will be done will be a subject at the conference with all the parties and counsel to be present on April 24, 1998 at 3:30 p.m.

7. For the purpose of a determination of the other remedies for the violations by the Schmitts and Mednica, all the parties are directed to appear at the conference on April 24, 1998 at 3:15 p.m.

8. The parties are directed to advise the court in writing within ten days of the date of this decision, as to their recommendations for the accomplishment of the restoration of the Hook and the remedies for the violations by the Schmitts and Mednica.

SO ORDERED.

### *APPENDIX*

Figure 1 City Ex. DA—The Developer's Map; Pp. 5, 6

Figure 2 Ex. B–19—Shaded area not conveyed to United States in Gateway

Figure 3 Def. Ex. B–40—Adam Schmitt placed orange lines on map to show the area of his marina (Included the Cove but not the Hook) (Editor's Note: Appendix not reproducible for purposes of publication.)

Figure 4 Def. Ex. B–42—Adam Schmitt's view of John's Fishing Station (Editor's Note: Appendix not reproducible for purposes of publication.)

Figure 5 Def. Ex. B–128—Administrative Law Judge Report

Figure 6 City Ex. BR—Map of Gateway National Recreation Area

Figure 7 City Ex. AL–1—Claim by City for additional rent for unleased land occupied by Schmitts AL–1 = total of $2,900,190.

10-11-90.

B-128

STATE OF NEW YORK
DEPARTMENT OF ENVIRONMENTAL CONSERVATION
50 Wolf Road
Albany, New York 12233-1550

In the Matter

- of -

Alleged Violations of the Environmental
Conservation Law Articles 15 and 25, and
of Parts 608 and 661 of Title 6 of the Official
Compilation of Codes, Rules and Regulations
of the State of New York by

JOHN M. SCHMITT

RESPONDENT

Case No. 2-RA-85-0003

HEARING REPORT

by

_____
Susan J. DuBois
Administrative Law Judge

## PROCEEDINGS

Pursuant to Title 6 of the Official Compilation of Codes, Rules and Regulations of the State Of New York ("6 NYCRR") Part 622, an administrative enforcement hearing was held to consider allegations by the Department of Environmental Conservation (the "Department") against John Schmitt (the "Respondent"), 64 West 20th Street, Broad Channel, New York 11693. The Department alleged that the Respondent violated Environmental Conservation Law ("ECL") Article 15 (Protection of Water) and Article 25 (Tidal Wetlands) and 6 NYCRR Part 608 (Use and Protection of Waters) and Part 661 (Tidal Wetlands Land Use Regulations) by placing fill, clearing, grading, and constructing a bulkhead at a marina located at 64 West 20th Street, Broad Channel, New York (the "Site").

This hearing was held on July 6, 1989 at the Department's Region 2 Office, Hunter's Point Plaza, 47–40 21st Street, Long Island City, New York, before Administrative Law Judge ("ALJ") Susan J. DuBois.

The Respondent was served with a Notice of Hearing and Compliant by certified mail, return receipt requested, on June 8, 1989. This Notice set the time and place of the hearing as 10 A.M. on July 6, 1989, at the Region 2 Office at the above address. On June 21, 1989, a Notice of Adjournment was sent to both Parties stating that the hearing was adjourned by one hour, to begin at 11:00 A.M. on July 6, 1989.

At the time scheduled for the hearing, neither the Respondent nor any representative of the Respondent was present at the hearing location. The Department appeared at the hearing by Cyril H. Moore Jr., Esq., Regional Attorney. At approximately 11:25 A.M., Mr. Moore stated that he had called the Respondent a few minutes before that and that a woman at the Respondent's office had stated that the Respondent was in the yard. Mr. Moore further stated that he had asked her to ask the Respondent to call Mr. Moore. No response was received from the Respondent and the hearing proceeded at 11:25 A.M. as a default. The Respondent had not appeared and had not contacted Mr. Moore or the ALJ by 1:25 P.M. when the hearing concluded.

The Department called as witnesses the following persons: Environmental Conservation Officer ("ECO") John Burke; Glen Chernick, City of New York Division of Real Property; Charles Hamilton, Chief of the Marine Regulatory Section, Bureau of Marine Habitat Protection, NYSDEC Division of Marine Resources; and ECO Edward B. Moore, Coastal Zone Management Officer for Region 2.

The stenographic transcript of the hearing was received on August 3, 1989 and the hearing record was closed on that date.

On or about August 15, 1990, Gary Westphal, Esq., an attorney representing Mr. Schmitt in another matter, contacted ALJ DuBois to inquire whether this hearing had been held and whether an Order had been issued. ALJ DuBois informed Mr. Westphal that the hearing had been held but that no Order had yet been issued, and that there was a transcript of the hearing which Mr. Westphal could review. No request for reopening the record has been received.

*Charges and Relief Sought*

The Department charged that the Respondent placed fill, cleared, graded, and constructed a bulkhead at the Site without a permit, in violation of the Tidal Wetlands Act and ECL Article 15, and placed fill and graded the fill in the adjacent area of a tidal wetland without a permit for this work. The Department sought imposition of a civil penalty of at least $120,000 ($45,000 for the tidal wetland violations and $75,000 for the Article 15 violations), an order prohibiting work on the Site in violation of the ECL, and an order requiring restoration of the areas affected by the work already done in contravention of the ECL. At the hearing, the Department requested that the Respondent be ordered to restore the area filled in 1988 partly as high marsh and partly as intertidal marsh.

The proposed penalty was calculated on the basis of $3,000 per day times 15 days for violation of the Tidal Wetlands Act and $5,000 times 15 days for violation of ECL Article 15. The Department stated that a larger penalty could have been requested since the violation was in effect for more than 15 days, but that the requested penalty had

been limited in order not to create a hardship.

*The Answer*

No written answer was filed and the Respondent did not appear at the hearing.

## FINDINGS OF FACT

1. The Site of the alleged violations is a marina located at 64 West 20th Street, Broad Channel, New York. Broad Channel is located on Jamaica Bay in Queens County. John Schmitt (the "Respondent") is the proprietor of the marina. He resides upstairs from the marina office and also has a residence in Colorado.

2. At the time of the hearing, the land at the Site was owned by the City of New York and had been leased since at least 1959 to Adele Schmitt, doing business as Adams Fishing Station. The relationship between Ms. Schmitt and the Respondent was not identified.

3. On November 19, 1984, Environmental Conservation Officer ("ECO") John Burke went to the Site and observed that a wooden breakwall or bulkhead had recently been constructed in a mudflat area, below the mean high water mark. He also observed that rock, concrete and dirt had recently been placed in a tidal wetland area located below mean high water and containing marsh grass, behind the bulkhead. These materials partially filled the area behind the bulkhead but they had not yet been built up as high as the top of the bulkhead. The bulkhead was approximately 80 (eighty) feet long and the area of fill behind the bulkhead was described as "approximately ten yards by ten yards".

4. ECO Burke then spoke with the Respondent, who stated that he was the person conducting the work on the Site. ECO Burke asked to see the permit for the work. The Respondent answered that he did not have a permit and was not aware that one was required for the work which was taking place. ECO Burke told the Respondent that the activities were illegal and that a permit from the Department was required. The Respondent said that he would contact the Department.

5. The Respondent submitted an application for removal and replacement of an existing bulkhead, construction of additional new bulkhead, and placement of fill. The application was dated November 30, 1984 but also bore a note stating "Sent 12–5–84". There was no indication of whether the application was determined to be complete or incomplete, nor of any further proceedings pursuant to the Department's permit application procedures (6 NYCRR Part 621). No permit for these activities was issued by the Department. The area in which the bulkhead was built is identified on the Department's tidal wetlands map as "SM" or shoals and mudflats.

6. Additional fill was placed landward of the bulkhead at some time between ECO Burke's inspection and August 23, 1988 when an additional photograph of the bulkhead was taken by another Department employee.

7. Remediation of the bulkhead location would involve removing the bulkhead and the fill and relocating them to a location at or above the mean high water as that existed immediately prior to construction of the bulkhead. It would also involve planting to replace any intertidal marsh vegetation that had been destroyed.

8. On July 19, 1988, Charles Hamilton visited the Site at the request of the Department's Region 2 Attorney. Mr. Hamilton spoke with the Respondent and told him that a permit was required for regulated activities in or adjacent to tidal wetlands. Mr. Hamilton testified that he observed two additional violations of the Environmental Conservation Law at the Site on that date, but did not identify or describe such violations.

9. On August 23, 1988 Mr. Hamilton visited the Site again and found that some additional docks had been constructed. Mr. Hamilton again spoke with the Respondent about the need for a permit on that date.

10. On both September 7, 1988 and November 15, 1980, Mr. Hamilton visited the Site for additional inspections. On November 15, 1988, he found a new area of fill south of the marina and measuring approximately 100 feet by 100 feet, which had been graded. This area had not contained fill at the time of

Mr. Hamilton's earlier visits. In addition to the graded fill, the area contained 15 piles of fill, approximately ten cubic yards each, which had not been graded. Mr. Hamilton spoke with the Respondent again on November 15, 1988. The Respondent did not indicate to Mr. Hamilton why the additional fill had been placed. At the hearing Mr. Hamilton testified that in his opinion the fill appeared to have been placed for an extension of an almost full boat storage area located north of the filled area. In December of 1988, ECO Edward Moore observed boats stored on the graded fill.

11. The nature of this filled area immediately prior to the placement of the fill is not clear from the testimony and the exhibits. It was, however, at least the adjacent area of a wetland if not actually tidal wetland.

12. With regard to the area which was filled in late 1988, the Department proposed that 80% of this area be revegetated as intertidal marsh and that the remaining 20% be revegetated as high marsh, corresponding with the vegetation depicted on the tidal wetlands map. As part of this work, the Department proposed that the intertidal marsh portion be regraded to an elevation below mean high water and that the high marsh portion be regraded to an elevation between mean high water and spring high water.

13. This second filled area had been high marsh and intertidal marsh at the time when the tidal wetlands maps were made, and there is no indication that the map was amended to reflect any later disturbances. There is also no indication that any permits were issued for activities at this location or in the wetland area south of the marina generally.

14. Vehicle access to the areas of the bulkhead and the November 1988 fill area is somewhat limited and requires driving past the marina office, where the Respondent also lives at least part of the time.

## DISCUSSION

As noted in Finding No. 10, the record is unclear regarding the nature of the area in which fill was placed in late 1988. As a result, there is some difficulty in identifying what should be done to restore this area to its condition prior to the violation.

The approximate location of the filled area, as outlined on a photocopy of the Department's Tidal Wetlands Map No. 598–494, is about one-quarter HM (high marsh) and three-quarters IM (intertidal marsh). The general area south of the marina was designated as IM and HM on the tidal wetlands map. In the aerial photograph on which the tidal wetland boundaries were drawn to make the map, the area south of the marina contained no conspicuous boats or other human-made features.

This same area appears in two aerial photographs which were taken on June 15, 1988, one of which shows scattered boats, vehicles and other objects stored south of the marina. The other June 15, 1988 photograph also shows several boats lying on the ground where the fill was later placed. The nature of the vegetation in this area is not apparent from the June 15, 1988 photograph and was not described in the testimony. It appears in the June 15, 1988 photograph to be low vegetation, with a few shrubs and no trees.

At the hearing, the filled area was described as being "eleven feet landward of an existing tidal marsh which would be identified as a high marsh dominated by salt hay". A photograph taken of the filled area on November 15, 1988 (Exhibit 14) shows an area of intertidal marsh between the photographer and the fill, with high marsh between the intertidal marsh and the fill. There was no testimony that intertidal marsh or high marsh existed within the filled area at the times of the July, August or September, 1988 inspections. This area was only described as not containing the fill at the times of Mr. Hamilton's first three inspections and as being accurately represented by the June 1988 photos. The filled area was described in the Complaint as the adjacent area of a tidal wetland.

It appears likely that this location was gradually disturbed and filled to some extent over the years between when the map was prepared and November, 1988. Although any such disturbances might have been

caused by the Respondent, the person responsible was not identified.

If the area which was filled in 1988 area had been tidal wetlands, the placement of fill would have destroyed whatever biological and hydrological benefits the wetland would have provided. If this area had instead been the adjacent area of a wetland at the time when the fill was placed, the effects would have been less. Adjacent areas do, however, serve a function as buffers to protect the adjoining tidal wetlands. It would be necessary to remove the fill and restore the filled area, but the record is not clear regarding the conditions existing prior to the violation.

The conditions at the filled area at the time when the fill was placed are also relevant to whether or not the filling was in violation of Environmental Conservation Law Article 15. It was not proven that this area was below mean high water nor that it was wetland which was adjacent and contiguous to navigable waters, and the record does not support drawing an inference that either of these conditions existed.

## CONCLUSIONS

1. Environmental Conservation Law Section 25–0401 provides, in pertinent part, that after completion of the tidal wetland inventory (the tidal wetland maps) "... no person may conduct any of the activities set forth in subdivision 2 of this section unless he has obtained a permit from the commissioner to do so." The regulated activities identified in ECL subdivision 25–0401.2 include "... any form of dumping, filling, or depositing ... of any stones, sand, gravel, mud, rubbish: or fill of any kind; the erection of any structures or roads, the driving of any pilings or placing of any other obstructions, whether or not changing the ebb and flow of the tide, and any other activity within or immediately adjacent to inventoried wetlands which may substantially impair or alter the natural condition of the tidal wetland area."

2. ECL Section 25–0103 defines tidal wetlands as "those areas which border on or lie beneath tidal waters, such as, but not limited to, banks, bogs, salt marsh, swamps, mead- ows, flats or other low lands subject to tidal action, including those areas now or formerly connected to tidal waters;" and lists plant species which grow in tidal wetlands, including salt hay (*Spartina patens*) and low marsh cordgrass (*Spartina alterniflora*).

3. 6 NYCRR Subdivision 661.4(b) defines the adjacent area of tidal wetlands. In the present case, there is no indication of any structures or topographic features in the area south of the marina which would modify the 150 foot width of the adjacent area applicable within the City of New York. Thus, the landward boundary of the adjacent area would be 150 feet landward of the most landward tidal wetland boundary.

4. 6 NYCRR Subdivision 661.5(b) lists various uses of tidal wetlands and designates whether a permit is required for such uses. Construction of bulkheads (Item No. 29) is an activity which requires a permit if done in any type of tidal wetland or in the adjacent area. It is presumptively incompatible with intertidal marshes and high marshes and generally compatible, although a permit is still necessary, in shoals and mudflats. Filling (Item No. 30) also requires a permit if done in any type of wetland or in the adjacent area. Filling is presumptively incompatible with shoals and mudflats, intertidal marsh, and high marsh. Filling is generally compatible with the adjacent area, although a permit is required.

5. The Respondent violated ECL Article 25 and 6 NYCRR Part 661 by constructing a bulkhead in a tidal wetland in 1984 and by filling in the tidal wetland behind the bulkhead, without a permit for these activities. The Respondent admitted responsibility for these activities, by his statement to ECO Burke as described in Finding No. 4. There was a further violation at some time between November 19, 1984 and August 23, 1988 in that additional fill was placed behind the bulkhead. It can be concluded that the Respondent was responsible for the second violation as well, since it is a continuation of his earlier activity, since it was carried out at his marina, and since it is unlikely that it would have been done other than at his direction.

6. ECL Section 15–0505 provides, in pertinent part, that: "No person ... shall exca-

vate or place fill below the mean high water level in any of the navigable waters of the state, or in marshes, estuaries, tidal marshes and wetlands that are adjacent to and contiguous at any point to any of the navigable waters of the state and that are inundated at mean high water level or tide without a permit issued pursuant to subdivision 3 of this section." 6 NYCRR Section 608.4(a) contains a similar provision.

7. The Respondent violated ECL Article 15–0505 and 6 NYCRR. Section 608.4(a) by placing fill behind the bulkhead, on a mudflat below the mean high water level and on the adjacent marsh, some time shortly before November 19, 1984. The Respondent further violated CL Article 15–0505 by placing or causing the placement of additional fill at this location at some time between November 19, 1984 and August 23, 1988.

8. The placement of fill at the area south of the marina, as observed on November 15, 1988, was in violation of ECL Article 25 and 6 NYCRR Part 661 regardless of whether tidal wetlands conditions actually existed at the filled area immediately prior to placement of the fill. The filled area was at least within the adjacent area of a tidal wetland, by being 11 feet from the landward edge of high marsh vegetation. The filled area is also depicted as tidal wetland on the current tidal wetlands map. The Respondent was under an obligation to obtain a tidal wetlands permit and/or to request an amendment of the tidal wetlands map before placing the fill.

9. The filled area south of the marina is only accessible by going past the marina. It is unlikely that numerous truckload of fill would have been brought in and graded without the Respondent's knowledge and permission or, for that matter, without the Respondent having paid for or otherwise obtained the fill. In addition, the Respondent was using the filled area for boat storage in December of 1988. It can be concluded that the Respondent is responsible for placement of this fill as well.

10. It was not shown that the filled area was below the mean high water level in late 1980 at the time when the fill would have been placed. Thus, it cannot be concluded that this filling was in violation of ECL Article 15.

11. With respect to violations of ECL Article 25, ECL Section 71–2503 authorizes the Commissioner "to direct the violator to cease his violation of the act and to restore the affected tidal wetland or area immediately adjacent thereto to its condition prior to the violation, insofar as that is possible within a reasonable time and under the supervision of the commissioner."

12. The Department proposed that the Respondent be required to remove the bulkhead and the fill and to relocate the bulkhead to a location at or above the former mean high water line and to restore any marsh vegetation that might have been covered by the fill. Prior to the 1984 violation, this area was shoals and mudflats, with some amount of intertidal or high marsh as indicated by the marsh grass observed by ECO Burke. The values of this wetland, in terms of fish and wildlife use or hydrological values, are not in the record. The wetland had already been covered with fill at the time of ECO Burke's inspection, and its condition prior to the violation could no longer be observed. The filled area, as it presently exists, provides none of the values which are attributed to tidal wetlands generally. In order to restore the wetland, and for it to have any value as a wetland, the bulkhead and fill would need to be removed. The environmental effects, if any, of the temporary disturbance caused by removing the bulkhead and the fill were not an issue in the hearing and were not evaluated.

13. Although the Respondent applied for a permit for a bulkhead, which may or may not correspond with the work which had already been carried out, no permit was issued. The work which was done involved placing fill in a tidal wetland, an activity presumptively incompatible with shoals/mudflats, intertidal marsh and high marsh. The record provides no indication of any need for placing the bulkhead and the fill in the wetland. On the basis of this record, it appears unlikely that the bulkhead and the fill behind it would have been permitted at the location where the Respondent placed them.

14. With respect to the second filled area, south of the marina, the condition of this area at the time immediately prior the violation which occurred in 1988 is uncertain. It was not proved that this area had been intertidal marsh or high marsh at the time of the violation, and it may instead have been adjacent area. This area would need to be restored by removing the fill and replanting the filled area with adjacent area and/or marsh plants as appropriate in order to restore its prior condition.

16. ECL Section 71–2503, as it read at the time of the violations and at the time of the hearing, provided that any person who violates any provision of ECL Article 25 shall be liable for a civil penalty of not to exceed $3,000 for every such violation. ECL Section 71–1107 provides for a civil penalty of not more than $5,000 for a violation of ECL Section 15–0505. ECL Section 71–1107 and former Section 71–2503 do not provide for each day's continuance of the violation to be treated as a separate violation.

## RECOMMENDATIONS

The above violations took place in 1984 through 1988, prior to the January 1, 1990 effective date of the 1989 amendments to ECL Section 71–2503 (Laws of 1989, Chapter 666), which changed certain provisions regarding penalties for tidal wetlands violations. The violations and the hearing on them also took place prior to the issuance of the Department's Tidal Wetlands Enforcement Guidance Memorandum, which was issued on February 9, 1990. The penalty recommendations of this Hearing Report reflect the penalties found in Orders issued for tidal wetlands violations in the late 1980's, prior to the amendments and the new enforcement guidance.

In view of the Findings and Conclusions of this Hearing Report, it is recommended that:

1. The Respondent be required to remove the bulkhead and the fill placed in 1984 and at the unknown subsequent date, and to restore the wetland in accordance with more specific directions and a timetable to be provided by the Department Staff.

2. The Respondent be required to remove the fill which was placed in the 100 by 100 foot area south of the marina in late 1988, to restore this area to its condition prior to the violation in accordance with a restoration plan approved by the Department Staff, and to submit a restoration plan acceptable to the Department Staff, such plan to be submitted within 30 days of the service of a conformed copy of the Order upon the Respondent.

3. The Respondent be assessed a civil penalty in the amount of $10,500 (ten thousand five hundred dollars), calculated as follows: $2,500 for the initial construction of the bulkhead and backfilling, $5,000 for the placement of additional fill after having been informed that this activity was in violation of the Environmental Conservation Law, and $3,000 for placement of the fill south of the marina in 1988. Of this $10,500 penalty, $5,000 would be payable within 30 days following service of a conformed copy of the order upon the Respondent, and $5,500 would be suspended conditioned on satisfactory completion of the remedial work described in Recommendations 1 and 2 above, to become payable if the remedial work were not satisfactorily completed by the required dates.

GATEWAY NATIONAL
RECREATION AREA

Jamaica Bay

Floyd Bennett Field

Jacob Riis Park

Fort Tilden

Breezy Point Park

DEFENDANT'S EXHIBIT BR

City Ex. BR

Federal Property to be included in Gateway

City Property to be conveyed to the Federal Government for Gateway

Property excluded from Gateway

FILE # 93085154 - SCHMITTS MARINA
BROAD CHANNEL ISLAND,QUEENS,N.Y.
CPI INDEXING OF VALUES AND RENTALS

| YEAR | INDEX | FACTOR | VALUE | RATE | RENTAL |
|---|---|---|---|---|---|
| 6/1/68 | 35.9 | 0.305 | $362,048 | 8.0% | $28,964 |
| 6/1/69 | 38.3 | 0.325 | 386,251 | 9.0% | 34,763 |
| 6/1/70 | 41.2 | 0.350 | 415,497 | 10.0% | 41,550 |
| 6/1/71 | 43.6 | 0.370 | 439,701 | 10.0% | 43,970 |
| 6/1/72 | 45.3 | 0.385 | 456,846 | 9.0% | 41,116 |
| 6/1/73 | 48.1 | 0.408 | 485,083 | 9.0% | 43,657 |
| 6/1/74 | 53.2 | 0.452 | 536,516 | 10.0% | 53,652 |
| 6/1/75 | 57.1 | 0.485 | 575,847 | 10.5% | 60,464 |
| 6/1/76 | 60.9 | 0.517 | 614,170 | 10.0% | 61,417 |
| 6/1/77 | 64.4 | 0.547 | 649,467 | 10.0% | 64,947. |
| 6/1/78 | 68.0 | 0.577 | 685,772 | 10.0% | 68,577 |
| 6/1/79 | 73.5 | 0.624 | 741,239 | 11.0% | 81,536 |
| 6/1/80 | 82.1 | 0.697 | 827,969 | 13.0% | 107,636 |
| 6/1/81 | 89.5 | 0.760 | 902,598 | 14.0% | 126,364 |
| 6/1/82 | 95.7 | 0.812 | 965,124 | 14.0% | 135,117 |
| 6/1/83 | 99.7 | 0.846 | 1,005,483 | 14.0% | 140,765 |
| 6/1/84 | 104.3 | 0.885 | 1,051,854 | 14.0% | 147,260 |
| 6/1/85 | 108.3 | 0.919 | 1,092,194 | 13.0% | 141,985 |
| 6/1/86 | 111.7 | 0.948 | 1,126,482 | 11.0% | 123,913 |
| 6/1/87 | 117.8 | 1.000 | 1,188,000 | 11.5% | 136,620 |
| 6/1/88 | | | 1,336,500 | 11.5% | 153,698 |
| 6/1/89 | | | 1,485,000 | 11.5% | 170,775 |
| 6/1/90 | | | 1,485,000 | 11.5% | 170,775 |
| 6/1/91 | | | 1,069,200 | 11.5% | 122,958 |
| 6/1/92 | | | 950,400 | 11.5% | 109,296 |
| 6/1/93 | | | 950,400 | 11.5% | 109,296 |
| 6/1/94 | | | 1,098,900 | 11.5% | 126,374 |
| 6/1/95 | | | 1,098,900 | 11.5% | 126,374 |
| 6/1/96 | | | 1,098,900 | 11.5% | 126,374 |

| TOTAL | | | | | $2,900,190 |

5154CPI
MISC-C/F

CITY EX. AL-1

